## STATE v. CENTRAL LUMBER CO.

### (TWO CASES.)

Where the only question raised by an assignment of error is the constitutionality of a statute, the question that the statute does not state an offense under Pen. Code, § 3, providing "that a crime or public offense is an act or omission forbidden by law, and to which is annexed upon conviction either of the following punishments: * * * (3) Fine," because it nowhere "forbids" the acts specified, is not properly before the Supreme Court on appeal.

Laws 1907, p. 196, c. 131, to define and prohibit unfair competition and discrimination, etc., provide (section 3) "that any person, firm or corporation violating the provisions of section 1, of the act shall upon conviction thereof be fined." Held, that it sufficiently prohibits the acts set out in section 1 to state an offense under Pen. Code, § 3, providing that a "crime" or "public offense" is an act or omission forbidden by law, and to which is annexed, upon conviction, a fine, though the law nowhere expressly "forbids" the act.

"Law" might be defined as the aggregate of those rules and principles of conduct promulgated by legislative authority or established by local custom, and our laws are the resultant derived from a combination of the divine or moral laws, the laws of nature and human experience, as such resultant has been evolved by human intellect influenced by the virtues of the ages.

A monopoly is the exclusive power, right, or privilege of selling a commodity, or of dealing in the same article or trading in the

same market; sole command in traffic in anything, however obtained.

Const. art. 17, § 20, providing that no incorporated company, partnership, or association of persons in the state shall combine or make any contract with any incorporated company through their stockholders or trustees, or assigns of such stockholders, or with any partnership or association of persons, to fix the prices, limit the production, or regulate the transportation, of any product so as to prevent competition in such prices, etc., or to establish excessive prices therefor, and that the Legislature shall pass laws for the enforcement of the section by adequate penalties, and in the case of incorporated companies, if necessary, may declare a forfeiture of their franchises, covers not only monopolies acquired by combination, but those obtained through unfair competition.

Under the state's police power, the Legislature may pass laws to protect the public against monopolies acquired by unfair competition.

A statute cannot be held invalid unless it is clearly violative of the provisions of the Constitution.

The police power is inherent in every government, and does not depend upon legislative grants or limitations.

The Legislature, within well-known and well-defined limitations, is the sole judge as to when and how the police power is to be exercised.

The "police power" is the power vested in the Legislature by the Constitution to make all manner of wholesome and reasonable laws, either with penalties or without, not repugnant to the Constitution, as they may judge to be for the good and welfare of the public.

Laws 1907, p. 196, c. 131, § 1, provides that any person, firm, or corporation doing business in the state, and engaged in the production, etc., of any commodity in general use, that intentionally, for the purpose of destroying competition of any regular established dealer in the commodity, or to prevent competition of any person who, in good faith, intends and attempts to become such dealer, shall discriminate between different sections of the state by selling such commodity at a lower rate in one section than in another section, etc., shall be deemed guilty of unfair discrimination. Section 2 provides that if complaint be made to the Attorney General that any corporation is guilty of unfair discrimination as defined by the act, he shall investigate, and if, in his opinion, sufficient grounds exist therefor, may prosecute, in the name of the state, to annul the charter or revoke the permit of such corporation, and that the court, finding such corporation guilty, shall annul the charter or revoke the permit, etc. Section 3 provides that any person, firm or corporation violating the provisions of section 1 shall, upon conviction thereof, be fined. Held that there is no classification of persons which would violate U. S. Const. art. 14, § 1, and Const. art. 6, §§ 2, 18,

providing that no person shall be denied the equal protection of the laws, the act bringing within the purview of the criminal provisions every person, partnership, and corporation in existence, and, under the civil provisions, every corporation, domestic and foreign, and containing only limitations as to the acts constituting the offense; and the fact that the Legislature has not included every means by which unfair competition might be created would not invalidate the act.

It is not for the courts to say whether the Legislature has passed a wise law, or whether it should have made it broader.

There can be a different punishment for a criminal offense imposed against a corporation than imposed against an individual, if the distinction is based upon reasonable grounds having relation to the crime and nature and condition of the parties.

Laws 1907, p. 196, c. 131, § 1, directed against unfair discrimination, provides by section 2 that, if complaint be made to the Attorney General that any corporation is guilty of unfair discrimination as defined by the act, he shall investigate the complaint, and, if he believes sufficient grounds exist, may sue in the name of the state to annul the charter or revoke the permit of such corporation, and the court, if finding such corporation guilty, shall annul the charter, or revoke the permit thereof, and permanently enjoin it from transacting business in the state. Section 3 provides that any person, firm, or corporation violating the provisions of section 1 shall, upon conviction thereof, be fined. Held, that the procedure against corporations is not a denial of the equal protection of the laws in that it is a punishment additional to that imposed against individuals; Const. art. 17, § 20, which prohibits monopolies and the fixing of prices, etc., to prevent competition, providing that the Legislature shall pass laws for the enforcement of the section by adequate penalties, and, in the case of incorporated companies, if necessary, may as a penalty declare a forfeiture of their franchises.

It is the province of the Legislature to decide what acts are sufficient to justify forfeiture of corporate charters and permits under the Constitution.

While corporations are entitled to the equal protection of the law with individuals, the inherent rights of a corporation are entirely separate and distinct from those of a natural person; they being created by the statute, with no powers except those conferred thereby.

At common law, corporations might forfeit their charters by the misuser thereof, not necessarily amounting to a crime; the question of forfeiture to be raised directly and adjudged by the court.

Under Code Civ. Proc. § 571, providing that in an action by the state's attorney in the nature of quo warranto to annul the charter of a corporation, whenever such corporation shall violate the provisions of any law by which such corporation shall have forfeited its charter or articles of incorporation by abuse of power, for-

feiture of a franchise may be adjudged for any act forbidden, and for any act which the charter does not expressly or impliedly authorize, if calculated to injure the public; franchises of corporations, whether under general or special laws, being grants from the sovereignty of the people, and the benefit to the country at large from th objects for which the corporations are created constituting the consideration.

The state having power to provide for the forfeiture of corporate franchises by the general statute, distinct from criminal statutes, it is not unconstitutional simply to combine them in the same statutes for separate articles, and hence section 2, Laws 1907, p. 196, c. 131, which act defines and prohibits unfair competition and discrimination, providing that the Attorney General may sue to annul the charter or revoke the permit of a corporation guilty of the acts prohibited by section 1 of the law, is not violative of the federal and state statutes, as providing a different punishment for corporations than for individuals; section 3 providing only a fine in the case of individuals or firms.

The Legislature having power, under the general statute for forfeiture of corporate franchises (Code Civ. Proc. § 571), to provide procedure whereby the Attorney General, in investigating the alleged guilt of a corporation under any of the grounds specified therein, including the abuse of power, could subpoena witnesses, administer oaths, take testimony, and require the production of books or other documents, it could provide therefor under Lawe 1907, c. 131, § 2, which act provides for the forfeiture of corporate franchises for acts amounting to unfair competition, which is embraced under the ground of abuse of power in the general statute.

The investigation of the Attorney General being purely civil in nature, the provision permitting him to subpoena witnesses, administer oaths, take testimony, and require the production of books or other documents, if construed to permit the calling of a corporation as a witness and the production of its books and documents, would be within the Legislature's power.

Laws 1907, p. 196, c. 131, § 1, providing that any firm, corporation, etc., shall be guilty of unfair discrimination which, being engaged in the production, manufacture, or distribution of a commodity in general use, shall intentionally, for the purpose of destroying the competition of any regular, established dealer in such commodity, or to prevent the competition of any person who in good faith intends and attempts to become such dealer shall discriminate between different sections of the state by selling such commodity at a lower rate in one section than in another section, etc., and providing penalties for such acts does not forbid the making of any contract, morally right and just, but only such as would injure the public, and hence is not unconstitutional as interfering with full freedom of contract.

(Opinion filed, Dec. 1, 1909.)

Appeals from Circuit Court, McPherson County. Hon LYMAN T. BOUCHER, Judge.

Two actions, one criminal and the other civil, by the State against the Central Lumber Company for violation of Laws 1907, p. 196, c. 131. In the criminal action there was a conviction and an order denying a new trial, and in the civil case a demurrer to the complaint was overruled, and defendant appealed in both cases, which were consolidated on appeal. Affirmed.

*Sears & Potter, Brown, Abbot & Somsen,* and *Seward & McFarland,* for appellant

1. Unlawful Discrimination. Any person, firm, or corporation foreign or domestic, doing business in the state of South Dakota, and engaged in the production, manufacture or distribution of any commodity in general use, that intentionally, for the purpose of destroying the competition, of any regular, established dealer in such commodity, or to prevent the competition of any person who, in good faith intends and attempts to become such dealer, shall discriminate between different sections, communities, or cities of this state, by selling such commodity at a lower rate in one section, community or city, or any portion thereof than such person, firm or corporation, foreign or domestic charges for such commodity in another section, community or city, after equalizing the distance from the point of production, manufacture, or distribution and freight rates therefrom, shall be deemed guilty of unfair discrimination. Session Laws 1907, chapter 131, p. 196. This statute is criminal in its nature and penal in its provisions, and must be strictly construed. Ex parte Brown, 21 S. D. 515; Black on Interpretation of Laws 57; U. S. v. Wiltberger, 5; Wheaton 76; Todd v. U. S., 158, U. S. 278; U. S. v. Larcher, 134, U. S. 624. No offense is created by this statute, because, while it defines unfair discrimination, which is in itself no offense, it nowhere forbids it so as to make it a crime. Haden v. Collector, 5 Wall. 110; Bishop Stat. Offenses, Sec. 46. The Penal Code, Chap. 1, Sections 2 and 3, provides: "Sec. 2. No act or omission shall be deemed criminal or punishable except as prescribed or authorized by this Code,  * * * *  , or such laws as do not conflict with the provisions of this Code. Sec. 3. A crime or

public offense is an act or omission *forbidden by law* and to which is annexed, upon conviction, the following punishments: (1) Death, (2) Imprisonment, (3) Fines, etc." It is axiomatic that statutes creating and defining crimes cannot be extended, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. There can be no constructive offenses, and before a man can be punished, his case must be plainly and unmistakably within the statute. Todd v. U. S., 158 U. S. 278; People v. Phyfe, 136 N. Y. 558; Sedgwich on Stat. L., 318; Minnehaha Co. v. Thorne, 6 S. D. 449; Kirby v. Western Union, 57 N. W. 202; Lewis' Sutherland Stat. Const. Sec. 521; State.v. Lovell, 23 Iowa 305; Haucks v. Brown, 44 N. W. 811; Woodruff v. State, 68 N. J. L. 89; Ex parte McNulty, 77 Cal. 164; Lewis' Sutherland Stat. Const. Secs. 521, 522, 523, 524, 525, and 526. This law can not be upheld upon the theory that its purpose and effect is to prevent the establishment of a monopoly. State v. Drayton, 114 N. W. 768. The act, by reason of arbitrary classification, denies the defendant equality under the law, and is for that reason violative of the constitutions, both state and federal. The guarantee of the South Dakota bill of rights that "no person shall be deprived of life, liberty or property without due process of law." (Sec. 2), which is the equivalent of the 14th amendment, and is a pledge of the equal protection of the law, and "no law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities which upon the same term shall not equally belong to all citizens or corporations" (Sec. 18), and the 14th amendment, withholds from the Legislature the power of such classification as shall not have some reasonable basis upon which to stand. State v. Scougal, 3 S. D. 55; Gulf Ry. Co. v. Ellis, 165 U. S. 150; Kiley v. Ry. Co., 119 N. W. 316, Marsh, O. J.; Nichols v. Walters, 37 Minn. 264; State v. Hammer, 42 N. J. L. 435; State v. Loomis, 115 Mo. 807; Cutting v. Kansas City Stock Yards Co., 183 U. S. 79; Larallee v. Ry. Co., 40 Minn. 249; Deppe v. Chicago R. I. & P. R. R., 36 Ia. 52; State v. Ashbrook, 154 Mo. 375; Cooley Constitutional Limitations (7th ed.) page 559; Consolidated Coal Co. v. Illinois, 185 U. S. 203; McLeans v. Kansas, 211 U. S. 539. The act is invalid because

the classification of corporations by Section 2, and the procedure therein provided for is violative of the constitutions, both state and federal. The classification heretofore discussed is referable to section 1 of the act. Missouri v. Lewis, 101 U. S. 22; Yick Wo v. Hopkins, 118 U. S. 356, 369; Connolly v. Union Sewer Pipe Co., 184 U. S. 559; Gulf, Etc. Ry. Co. v. Ellis, 165 U. S. 156.; Phipps v. Wis. Cen. Ry. Co., 136 Wis. 153. When a person by statute, natural or artificial, is denied an equal remedy in the law, or equal protection in the courts, such statute is void. Price et al v. Pennsylvania R. Co., 113 U. S. 218; Allen v. St. Louis Bank, 120 U. S. 27; Connolly v. Union S. P. Co., 184 U. S. 544. The statute must therefore be sustained, if at all, on the ground of just classification. A classification, in order to be valid, must be reasonable. It cannot be arbitrary selection. Gulf C. & S. F. R. Co. v. Ellis, 165 U. S. 150; State ex rel. Sanderson v. Mann, 76 Wis. 469; Black v. State, 113 Wis. 218; State ex rel. Risch v. Trustee, 121 Wis. 54; State v. Whitcom, 122 Wis. 110; Janesville v. Carpenter, 77 Wis. 288. The act interferes with freedom to contract. State v. Drayton, 117 N. W. 768; Hale v. Henkel, 201 U. S. 43; Butchers Union Co. v. Crescent City Co., 111 U. S. 746; ex parte Gavinia, 100 U. S. 339; Mulger v. Kansas, 123 U. S. 623; Humes v. City of Little Rock, 138 Fed. 929; Ex parte Hutchinson, 137 Fed. 949, 950; People v. Gillson, 109 N. Y. 389; Long v. State, 74 Md. 565; Ex parte McKenna, 126 Cal. 429; Ex parte Drexel, 147 Cal. 763; State v. Dalton, 22 R. I. 77; People v. Dyker, 72 App. Div. (N. Y.) 308; People v. Zimmerman, 102 App. Div. (N. Y.) 103; Young v. Commonwealth, 101 Va. 853; State v. Dodge, 76 Vt. 197; State v. Ramseyer, 73 N. H. 31; City Council v. Kelly, 214 Ala. 552; Commonwealth v. Emerson, 165 Mass. 146; Commonwealth v. Sisson, 178 Mass. 578; City of Winston v. Beeson, 135 N. C. 271; Hewin v. Allanta, 121 Ga. 723.

*S. W. Clark, Atty. Gen., Theo. J. P. Giedt, State's Atty.* and *James N. Brown,* for respondent.

At common law we find contracts and agreements in restraint of trade held to be contrary to the public policy and void. Beach on Monopolies and Trusts, Sec. 4; Central Ohio Salt Co. v.

Guthrie, 35 Ohio State 666. Early in the history of this country, statutes were enacted by the several states forbidding such practices and fixing penalties therefor. U. S. v. Trans. Missouri Freight Asso., 166 U. S. 290. We have said that the act now under consideration is but one step in the progress that has been made to check the oppression that results from either a monopoly or a trust. So far as the history of this legislation goes, in our state, it began with Chap. 154 of the Session Laws of 1890. This was followed by the act of 1893 (Chap. 171, Session Laws, 1893), followed by the constitutional amendment of 1896 (Sec. 20, Art. 17, Const.), followed by the act of 1897 (Chap. 94, Session Laws, 1897) and then by the act of 1907, now under consideraton. Though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. Bishop on Stat. Crimes Sec. 82, Lewis' Suth. on Stat. Con., Vol. 2, p. 962. A penal statute should receive a common sense construction, and its force should not be frittered away by niceties and refinements at war with the practical administration of justice. Zellers v. White, 208 Ill. 518; Johnson v. Graves, 72 Ill. App. 676; State v. Hogriever, 152 Ind. 652; State v. Small, 29 Minn. 216; State v. Bishop, 128 Mo. 373; State v. Sibly, 131 Mo. 519; State v. Foster, 22 R. I. 163; Gilbert v. Detruit, 91 Wis. 661. It is within the exclusive power of the legislature to declare what shall constitute a crime, to define it, and to provide a punishment therefor. State v. Shevlin-Carpenter Co., 108 N. W. 935; State v. Dorman, 9 S. D. 528; State v. Pierce, 31 S. E. 847; State v. Marshall, 64 N. H. 549; Weideman v. State, 56 N. W. 688; Dyer v. Placer Co., 27 Pac. 197. Unfair discrimination, as defined by this act, cannot be termed an innocent act, as by the unrestricted doing of the things interdicted by the act, a monopoly would naturally follow, and a monopoly is against the common law. 11 Coke 84, Eng. 1602. The state under its reserved police power, and for the general welfare, may prevent the creation of a monopoly within its borders. Aetna Ins. Co. v Commonwealth, 45 L. R. A. 363. Conceding, then, that the people of a state have the right to prevent monopoly, what is the limitation as to classification in so doing,

and what would be a reasonable classification in view of the necessary nature of the legislation? Sec. 18 of Art. 7 of the state constitution is as follows: "No law shall be passed granting to any citizen, class of citizens or corporations, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations." If the classification adopted in Chap. 131 is not violative of this constitutional provision, then it can scarcely be said to be violative of the other sections referred to by appellant. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application; if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment. Walston v. Nevin, 128 U. S. 578; Minneapolis v. Beckwith, 129 U. S. 26; Tinsley v. Anderson, 171 U. S. 106; Fid. Mut. Life Asso. v. Mettler, 185 U. S. 325; Gundling v. Chicago, 177 U. S. 183; Moseschum v. Tenement H. Dept., 70 L. R. A. 704; Bachtel v. Wilson, 204 U. S. 41; Heath and Milligan v. Worst, 207 U. S. 354; Atchison, Topeka, etc., Ry. Co. v. Matthews, 174 U. S. 106; Holden v. Hardy, 169 U. S. 397; Nat. Cotton Oil Co. v. Texas, 197 U. S. 130; Cook v. Marshall Co., 196 U. S. 261; Field v. Barber, 194 U. S. 618. Under the power inherent in every sovereignty a government may regulate the conduct of its citizens towards each other, and when necessary for the public good, the manner in which each shall use his property. Munn v. Illinois, 94 U. S. 113. The sale and distribution of lumber and builders' material in the state of South Dakota is internal commerce of the state, and as such is subject to the police power of the state, and may be regulated by law. Moore v. American Transportation Co., 24 How. 39; Covington & Cincinnati Bridge Co. v. Kentucky, 154 U. S. 210; Commonwealth v. Strauss, 191 Mass. 550; Greer v. Connecticut, 161 U. S. 519. The internal commerce of a state— that is, the commerce which is confined within its limits—is as much under its control as foreign or interstate commerce is under the control of the general government. Sands v. Manistee River Imp. Co., 123 U. S. 295; Spurr v. Travis, 108 N. W. 1090; McDaniels v. Shoe Co., 71 Pac. 37; Neas v. Borches, 109

Tenn. 398; Walp v. Mooar, 76 Conn. 515; Squire v. Tellier, 185 Mass. 18. The defendant here being a foreign corporation, its right of contract is not the same as a natural person, and it is not protected by the fourteenth amendment to the federal consituation. Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, p. 43; Paul v. Virginia, 8 Wall. 168.

WHITING, J.   Chapter 131, p. 196, Sess. Laws S. D. for the year of 1907, is in words as follows:

"An Act to Define and Prohibit Unfair Competition and Discrimination, and to Define the Powers and Duties of the Attorney General in Regard Thereto.

"Be it enacted by the Legislature of the state of South Dakota:

"Section 1. Unlawful Discrimination.—Any person, firm, or corporation foreign or domestic, doing business in the state of South Dakota, and engaged in the production, manufacture or distribution of any commodity in general use, that intentionally for the purpose of destroying the competition, of any regular, established dealer in such commodity, or to prevent the competition of any person who, in good faith intends and attempts to become such dealer, shall discriminate between different sections, communities, or cities of this state, by selling such commodity at a lower rate in one section, community or city, or any portion thereof than such person, firm or corporation, foreign or domestic charges for such commodity in another section, community, or city, after equalizing the distance from the point of production, manufacture, or distribution and freight rates therefrom shall be deemed guilty of unfair discrmination.

"Sec. 2. Duty of Attorney General.—If complaint shall be made to the Attorney General that any corporation is guilty of unfair discrimination as defined by this act, he shall investigate such complaint and for that purpose he may subpoena witnesses, administer oaths, take testimony and require the production of books or other documents, and, if in his opinion sufficient grounds exist therefor, he may prosecute an action in the name of the state

in the proper court to annul the charter or revoke the permit of such corporation, as the case may be, and to permanently enjoin such corporation from doing business in this state, and if in such action the court shall find that such corporation is guilty of unfair discrimination as defined by this act, such court shall annul the charter or revoke the permit of such corporation, and may permanently enjoin it from transacting business in this state.

"Sec. 3. Violation—Penalty.—Any person, firm, or corporation violating the provisions of section one (1) of this act shall upon conviction thereof be fined not less than two hundred dollars nor more than ten thousand dollars for each offense.

"Sec. 4. Remedies Cumulative.—Nothing in this act shall be construed as repealing any other act or part of an act, but the remedies herein provided shall be cumulative to all other remedies provided by law."

The state brought two actions in the circuit court, one criminal, charging defendant with having broken the above statute, the other civil, seeking under section 2 thereof to forfeit the right of defendant to do business in this state. Demurrers were interposed to both the criminal information and civil complaint, said demurrers attacking such information and complaint solely upon the ground that they did not allege facts sufficient, in the one case, to constitute a public offense, and in the other case, to state a cause of action; each demurrer being based solely upon the alleged unconstitutionality of the above statute. The demurrers were both overruled. In the civil case the defendant appealed from the order overruling such demurrer. In the criminal case trial was had, and verdict of guilty rendered, judgment entered, motion for new trial made and overruled. The defendant at all times saved his rights by timely objections and motions raising the questions of constitutionality of the said statute, and duly appealed from the judgment of conviction and order denying new trial. It is admitted by the appellant that the only question raised by either appeal is the said constitutional questions, and they are the only ones saved by assignments of error. The question involved in the two cases on appeal being therefore necessarily largely, if not entirely, the same, by agreement of parties and consent of this

court, the two causes have been presented together, and will be so decided.

The appellant in its brief has discussed the issues under the following headings: "(1) The Statute in Question is Criminal in Its Nature and Penal in Its Provisions, and must be Strictly Construed. (2) No offense is Created by This Statute, Because, While It Defines Unfair Discrimination, Which is in Itself No Offense, It Nowhere Forbids It So as to Make It a Crime. (3) This Law Cannot be Upheld upon the Theory That Its Purpose and Effect is to Prevent the Establishment of a Monopoly. (4) The Act, by Reason of Arbitrary Classification, Denies the Defendant Equality under the Law, and is for That Reason Violative of the Constitutions, Both State and Federal. (5) The Act is Invalid Because the Classification of Corporations by Section 2, and the Procedure Therein Provided for is Violative of the Constitutions, Both State and Federal. (6) Whether the Act can be Severed and Some Parts Saved While Others are Condemned. (7) The Act Interferes with Freedom to Contract."

The briefs on both sides are very full and exhaustive, and are a credit even to the eminent counsel engaged in this case. It will be impossible for us within the limits of this decision to discuss, in detail, the authorities cited, though we have given them careful consideration. For convenience we will take up the questions raised in the order in which they are treated in the appellant's brief.

The appellant, under the first heading, has gone into an exhaustive discussion of the rules of construction applicable to criminal statutes, for the purpose of showing, under the second heading, that the courts cannot read into the statute words so that such statute can be held to create an offense under section 3 of the Penal Code, which provides: "A crime or public offense is an act or omission forbidden by law, and to which is annexed, upon conviction, either of the following punishments: * * * (3) Fine"—the point made by appellant being that said statute in question nowhere "forbids" the acts that constitute the offense, and that therefore, under said section 3, Penal Code, there is no offense stated. The state had given this point

careful consideration, answering fully the brief of appellant, and calling attention further to the fact that this is not a question going to the constitutionality of the statute, and therefore not properly before us. The state is right in this contention, but inasmuch as the point has been fully discussed, and is a matter vital to the people of this state, we consider ourselves justified in considering and passing on the same. We have just recently affirmed a judgment imposing the death penalty for murder, and, if appellant is right in its contention, we have no such crime as murder in this state, the statute relating thereto containing no specific words forbidding the acts constituting the offense; and, under section 2 of our Penal Code, no act or omission is a crime except as prescribed by some statute of this state. In fact, if appellant was right, there would be scarcely a criminal offense provided for by our Code and our jails and state's prison should be emptied of the persons confined therein. Nevertheless it is true that, if there is nothing in the body of the statute before us that forbids the doing of the acts set forth in section 1 thereof, appellant is right, and has not committed any criminal offense.

Conceding for the purposes of this discussion that no reference can be made to the word "prohibit" found in the title, to aid in upholding the law, and conceding likewise that nothing can be read into this statute in aid thereof, and that we must look to the plain language of the statute for the prohibition of the said acts, and even disregarding section 10 of our Penal Code, providing: "The rule of common law that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and promote justice"— still does not section 3 of said statute plainly prohibit the acts set forth in section 1 by prescribing a punishment therefor? It certainly does. One man might say to his child: "To break Mr. Jones' windows is wrong, and I forbid your doing it." Another man says to his child: "To break Mr. Jones' windows is wrong, and if you do it, I will whip you." Does it need any legal research or extended study of statutory construction for the second child to determine that he, as well as the other child, is forbidden

to do the acts constituting the wrong? We think the second child would have a clear comprehension of the law of his home on this subject, and would hardly be in a position, after having broken the windows, to say to his father, "I did not know you forbade me to break the windows, you did not use the word 'forbid.'" In fact, if these two children were of very tender years, might it not well be that the first child, not knowing the meaning of the word "forbid," could well plead innocence, while, if his father had used the language of the other parent, he could not have so pleaded because he then would have known the fact that he was forbidden, while not knowing the meaning of the word "forbid"? Lawmakers should certainly be free, in the preparation of criminal statutes designed to control the actions of persons who have reached the age of criminal responsibility, to use the simple method of conveying an idea or thought which would be applicable in conveying such idea or thought to a child of tender years. Our Legislature has universally followed this common-sense method.

In State v. Ostwalt, 118 N. C. 1212, 24 S. E. 661, 32 L. R. A. 396, the court said: "It seems never before to have been doubted that the Legislature creates a criminal offense whenever it prescribes that a certain act shall be punishable either by a fine or imprisonment, or forbids it generally, and by implication empowers the court to impose either fine or imprisonment." Section 15 of the Penal Code of California is in substance the same as section 3 of our Penal Code; it reading as follows: "A crime or public offense is an act committed or omitted in violation of law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: * * * Third, fine." In the case of Dyer v. Placer County, 90 Cal. 276, 27 Pac. 197, the court was called upon to determine whether, in the light of such section, a public offense was created by a statute reading as follows: "Every person who shall fraudulently evade, or attempt to evade the payment of his fare for traveling on any railroad, shall be fined not less than five nor more than twenty dollars." The court, after quoting section 15 of their Penal Code, supra, well said: "To hold that a law which makes it a finable

offense to fraudulently evade the payment of railroad fare does not make such evasion a public offense would, we think, be going but skin-deep into its meaning. Qui haeret in litera, haeret in cortice."

Before taking up the consideration of those questions raised by appellant which involve the constitutionality of the law before us, it may be proper to consider briefly the purpose in the minds of the legislators in framing the law in question, and in connection therewith the evil sought to be cured, and, finally, whether such evil brings the remedy within that great body of laws known as "police regulations." The great and only excusable reason for the prescribing of any rule of conduct is to promote justice between man and his fellows in their relations as members of a social or political body. As was well said by Webster: "Justice is the greatest thing on earth." Law may be defined as the aggregate of those rules and principles of conduct promulgated by the legislative authority or established by local custom, and our laws are the resultant derived from a combination of the divine or moral laws, the laws of nature, and human experience, as such resultant has been evolved by human intellect, influenced by the virtues of the ages. Human laws must therefore of necessity continually change as human experience shall prove the necessity of new laws to meet new evils, or evils which have taken upon themselves new forms, or as the public conscience shall change, thus viewing matters from a different moral view point.

The effort to promote and effectuate justice by means of human laws has been a continuous fight against human selfishness, especially human avarice and greed, a continual effort to protect the weak against the strong. It is the boast of our law that it protects its wards in the full and free enjoyment of their lives, their liberties, and their property; and the cry that is always heard when any law is attacked on constitutional grounds is that it has, in some manner and to some degree, wrongfully deprived some one of equal protection in those cherished rights of life, liberty, and property. Yet common sense, as well as experience, has taught us that only through restraint can there be liberty; that

as members of one great social order, we can only be protected in our most treasured rights by at the same time being restrained in the use of the same so as not to deprive our fellow man of the equal enjoyment of such rights. Thus men have often been deprived of property, liberty, and even life, taken by the strong arm of law as a forfeit, a penalty, for having infringed on the rights of their fellows.

Among those things which human experience and the public conscience early recognized as essential and necessary to the highest welfare of all, was the right of free and equal competition in the struggles of life, not the right of freedom to crush one's fellows by force of brute strength or the equal brute force of greater wealth or power, but the right to have brute force, wealth, and power so restrained as to place the weakest, poorest, and lowliest on a free equality, before the law, with the strongest, richest, and most powerful. From an early date there have been laws against contracts and combinations in restraint of trade, and such laws became a part of the common law of this country. While practices in conflict with such laws have, at all times, been more or less frequent, yet, owing to industrial conditions existing up to the past 50 years, such practices had never become any serious menace to the rights of mankind; but, with the wonderful advance in industrial pursuits, and the vast accumulations of wealth during the past half century, there came new methods of business, including vast combinations to control the articles of commerce, bringing an awakening of public conscience to the evils thereof, and, as a result, many statutes were enacted, and even amendments to Constitutions adopted, aiming to the restoration of freedom and equality in commerce. The evils experienced being almost entirely those flowing from monopolies created through combinations, there were enacted what are known as the "anti-monopoly statutes," not merely making such combinations in restraint of trade unlawful from a civil point of view, but making such combinations criminal. Thus this state passed its Laws of 1890, 1893, 1897, and 1899, and adopted in 1896, section 20, art. 17, of the Constituton, which section provides as follows: "Monopolies and trusts shall never be allowed in this state and no incorporated com-

pany, copartnership or association of persons in this state shall directly or indirectly combine or make any contract with any incorporated company, foreign or domestic; through their stockholders or trustees or assigns of such stockholders, or with any copartnership or association of persons, or in any manner whatever to fix the prices, limit the production or regulate the transportation of any product or commodity so as to prevent competition in such prices, production or transportation or to establish excessive prices therefor. The Legislature shall pass laws for the enforcement of this section by adequate penalties and, in the case of incorporated companies, if necessary for that purpose may, as a penalty, declare a forfeiture of their franchises."

The statutes of most states, up to very recent years, were aimed only at monopolies brought about through combinations, so that, in treating of the subject of monopoly, both text-book writers and judges have spoken of them as though monopoly and combination were one and the same, thus causing many to consider that there could be no monopoly except there was combination, while, as a matter of fact, combination is simply a means, and but one of many means, by which a monopoly is acquired; monopoly being the end sought, combination a means therefor. It is well to consider the definition of monopoly as given by Webster: "(1) The exclusive power, right, or privilege of selling a commodity; the exclusive power, right or privilege of dealing in some article, or of trading in some market; sole command in the traffic in anything, however obtained; as, the proprietor of a patented article is given a monopoly of its sale for a limited time;  *   *   * a combination of traders may get a monopoly of a particular product."

A glance at the above-quoted provision of our Constitution will show that it is aimed at all monopolies, while it calls attention particularly to those acquired through the then prevalent method. While our lawmakers and courts were busy trying to cure the evil of monopoly by destroying combinations created therefor, human ingenuity, prompted by avarice and greed, was also busy devising methods of evading the law and creating a monopoly without combination, and the brains at the head of the most powerful

corporations known to mankind soon discovered a way. Every person of mature years well knows the success that has attended their efforts along this line and the result thereof.

To get rid of competition, and thus acquire a monopoly, the man, firm, or corporation possessed of, or controlling, large capital no longer said to his competitor: "Let us combine, and thus obtain a monopoly of the business we are engaged in, and by so doing increase our profits by raising prices to the consumer." No, that would be criminal, and might lead to trouble, and, too, it was a crude way of acquiring the thing sought. Now he says to a competitor, if such competitor be weaker than he: "Get out of my way. Sell me your business, or I will destroy it by unfair competition"—or in many cases, without giving his victim a chance to sell to him the business he has, he sets about destroying it, and by a method as certain as the passing of time, a method that need bring to him not even an immediate financial loss. He puts the price of the commodity handled so low, at the point where his victim is in business, as to make it impossible to meet such price except at a loss, and, to offset what loss he suffers at that point, he raises prices at one or more other points. As soon as this practice became quite prevalent, the public realized that an old evil was being brought upon them by a new method; a method that not only tended as its natural and necessary result to place a monopoly into the hands of the strong, but did not, as before, permit the competitor to share in the fruits of the wrong—an evil bringing loss to the public and wrong and injustice to the weak tradesman. Again human experience, recognizing the laws of God and nature, controlled and guided by an aroused public conscience, evolved a new law, and placed it upon the statute books of this and many other states, a law aimed at monopolies obtained through unfair competion. The question before this court, as it was before the court in case of State v. Drayton, (Neb.) 17 N. W. 768, is, Are these laws constitutional as being within the scope of the police powers, or is the state helpless to grapple with and destroy this new evil, because in so doing it will take from the wrongdoer the full enjoyment of right to life, liberty, and property? We have no hesitancy in saying that this class of legislation comes directly within the intendment of section

20, art. 17, of our Constitution, and that there is nothing in the third point raised by appellant that: "This law cannot be upheld upon the theory that its purpose and effect is to prevent the establishment of a monopoly."

We not only believe it can be upheld upon the above theory, but also that it comes under the scope of proper police regulation as recognized by the authorities, and this, not only because it is intended, and would naturally tend to prevent a wrong to the public, but because we believe it is inherent in the powers of the state to protect one citizen against "unfair competition" of another citizen, where such "unfair competition" is used as a means to, and with the intent to, deprive such other of his rightful enjoyment of property or the use thereof. Can it be held that this evil which threatens the very foundations of our economic system, and through it the very foundations of a free government, cannot be reached, for the reason, forsooth, that it interferes with the right of free contract on the part of the individual guilty of the wrongful practice? Bear in mind at all times that this law is aimed only at persons who resort to such "unfair" methods with the "intent" to destroy the business of their competitors.

The Legislature recognized the evil, and acted with full knowledge of the necessity confronting it, and shall we say that it has exceeded its powers in passing a law of this nature? As said by the court in State v. Drayton, supra: "At the beginning of our investigations we are confronted with the oft-repeated and well-settled doctrine that no act of the lawmaking power of the state can be held unconstitutional, unless it is clearly violative of the provisions of the Constitution; that, if it is legally possible to sustain legislative enactments, they should not be held void. We are further met with another well-known rule that what is known as the police power is inherent in every government, and does not depend upon legislative grants or limitations. Then unless the act under consideration is open to attack as in violation of the written provisions of the fundamental law, or an illegal effort to extend the police power over a subject which cannot be brought within the rightful exercise of that power, the law must be sustained. It must also be remembered that with reference to the

latter subject the legislative department of the state, within well-known and well-defined limitations, is the sole judge as to when and how that power is to be exercised.   From a careful reading and study of the act in question we are driven to the conclusion that it is not subject to attack upon either of the grounds named." In the above case the court quotes from the words of the judge in Yick Wo v. Hopkins, 118 U. S. 370, 6 Supt. Ct. 1071, words which are as true as they are burning: "The very idea that one man may be compelled to hold his life, or the means of living, or any material rights essential to the enjoyment of life, at the mere will of another seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."   And again in the Nebraska case we find quoted the following words, also coming to us from that great tribunal in the decision of the Sinking Fund Cases, 99 U. S. 700: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt. * * * The power which the Legislature has to promote the general welfare is very great, and the discretion which that part of the government has in the employment of means to that end is very large."

Many attempts have been made to define the term "police power" as applied to legislation.   Justice Shaw, in. the case of Com. v. Alger (Mass.) 7 Cush. 53, said: "It is much easier to perceive and realize the existence and source of this power than to mark its boundaries, or prescribe limits to its exercise."   However, in the same case this great jurist gave what is perhaps the best definition ever attempted, defining it as: "The power vested in the Legislature by the Constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same."

The law books are full of cases where parties have been restrained from "unfair competition," or have been mulcted in damages for such "unfair competition" in the use of another's trademark or trade-name, or in the use of trade-marks and trade-names similar to those which had been in use and established by another,

and even where the trade-name was the name of the party trying to use same. Internat. Silver Co. v. Rogers Corp., 67 N. J. Eq. 646, 60 Atl. 187, 3 Am. & Eng. Ann. Cas. 804. And most of the states have passed statutes regulating the use of such trade-names or trade-marks, some even going so far as to make the wrongful use of same criminal, and such statutes are constitutional. The Supreme Court of California in the case of Weinstock, Lubin & Co. v. Marks, 109 Cal. 529, 42 Pac. 142, 30 L. R. A. 182, held a mandatory injunction proper to prevent a party from continuing a store which he was conductng in a building built by the side of a competitor's place of business, it appearing that he had built it to nearly or quite resemble the other in appearance, and was using on the outside a trade-mark which had been adopted previously by the other store, and . was failing in any manner to designate his store from his competitor's; it further appearing that that this was being done with intent to draw trade from the competitor. The court said: "It may be said that the adjudged cases for relief are based solely upon the ground of loss and damage to the trademan's business, by unlawful competition."

The law in question is certainly constitutional, unless it in some manner conflicts with some express provision of our Constitution or that of the United States, and this brings us to the fourth point suggested by appellant that: "The act, by reason of arbitrary classification, denies the defendant equality under the law, and is for that reason violative of the Constitutions, both state and federal." It is the claim of appellant that the law in question violates section 1, art. 14, of the federal Constitution and sections 2 and 18, art 6, of the Constitution of this state; said sections of the state Constitution being in substance the counterpart of the provisions found in the federal Constitution. Appellant has argued at great length, and cited numerous authorities upon the question of what constitutes proper classification in criminal statutes; but, under the view which we take of the statute now before us, it is unnecessary to determine what the proper rules for such classification are, and attempt to apply them to the provisions of this statute, . for the reason that it appears clear to us that there is absolutely no attempt at classification in this statute.

The Nebraska statute was attacked upon this same ground in the Drayton Case above mentioned, and like arguments were presented to that court as are presented to us. That court, in answer to the claim that there was an arbitrary classification directed against the man having stores in more than one place, and in favor of the single store-keeper, said: "To this we must be permitted to say that we are unable to find any provision in the act which is susceptible of the construction contended for." That court then proceeded quite briefly to draw illustrations in support of its conclusions. The appellant herein, referring in its brief to the Drayton Case, says: "The Nebraska court does not seem to have seriously considered the question of classification involved there and here." While we believe the reasoning in the Drayton Case is sound and that we might rest this decision, as regards this feature of the case, upon a mere approval of the Drayton Case, yet we feel justified in attempting, somewhat more fully than did the Nebraska court, to show the weakness of appellant's contention.

Appellant says that the following persons are without the law: "(a) Persons who sell at one place only; (b) persons who sell at two or more places, but who, with the intent and purpose of destroying a competitor at one of such places, makes the same low prices which are necessary so to do at both places; (c) persons who sell at two or more places ,and who, with the intent and purpose of destroying a competitor at each place, makes the necessary low prices at all places." A complete answer to this contention is that the persons above specified are without the law, not because they are left out by any classification created by such law, but rather because in each of said cases there would be lacking one of the elements going to make up the particular criminal act created by this statute, to wit, discrimination between two points. As we have said, there is no attempt at classification by this act. The only classification claimed by appellant is a classification as to persons, yet this law applies to every existing person, partnership, or corporation, without regard to wealth, age, situation, color, or any other method of distinction. In the determination of whether a crime has been committed there are always

these two things at least to be considered: First, the persons committing the offense; and, second, the acts constituting the offense. As to the first, there may be such a classification by the statute as will render such statute unconstitutional, but not so as regards any restriction or limitations as to the acts constituting the offense. Let us illustrate. While the Legislature could not make some particular class of persons guilty of murder, when such persons killed their fellow men by some peculiar method or means, and at the same time exempt another class of persons from punishment for killing their fellow men by the same method or means, unless the attempted classification had some logical or natural relation to the nature of the method or means enmployed, yet it would be clearly within the power of the Legislature to make such killing, by such peculiar method or means, murder, even if the Legislature should utterly fail to pass any law whatsoever making killing by any other means or method a crime.

The appellant in his brief says: "This law in order to be sustained must be brought within the principle that no man ought to be allowed to use his own property, or conduct his own business, so as to destroy the property or business of his neighbor. If such were the scope of the act, the only question would then be whether it was an unwarranted restraint upon the liberty of contract. The evil, if any, which this law is aimed at is not discrimination between places, but ruthless competition, with the purpose, on the part of one competitor, to utterly destroy the business of another." In this the appellant is only in part correct. The object of this law is, not only the protection of the competitor, while this is without question one of the objects the Legislature had in mind, yet undoubtedly the prime object was the protection of the public against monopoly.

At another place in its brief the appellant, after referring to the principle of law that courts are not bound by the mere form or pretense of a statute, but that it should look at the substance thereof to see whether the same is really what it purports to be, and whether, while purporting to be within some constitutional limitation, as within the police power, it is not in fact an invasion of some constitutional provision, says: "Applying this principle,

we are warranted in saying that the aiming of this statute at the so-called unjust discrimination is a shallow pretense, and that the so-called unjust discrimination relates to the persons, and not to the act, and is in fact a classificaton of such persons; that the act of discrimination cannot of itself be within the prohibitive police power of the state, and· that the act of malicious competition, if it be a violation of. the principle that every citizen must so exercise his own right. as not to injure another, is nevertheless an evil under all circumstances, and that if the Legislature may prohibit at all, it must do so by a statute, which is not void by reason of arbitrary and unreasonable classification of the persons upon whom it operates." Again it seems to us that the appellant is shooting wide of the mark. It is resting on an alleged arbitrary classification of persons, based upon their conditions, and yet, in the words above quoted, it will be seen that what it is now complaining of is not that the law does not reach all persons, but rather that the law does not reach all the means which may be used to bring about the wrong aimed at.

It may be well again to revert to the history and origin of this legislation.. Legislation of this class, including as it does the so-called anti-monopoly laws, is all directed to the prevention of monopoly. Monopoly and competition being the exact opposites, anything tending to destroy competition tends towards monopoly. As we have stated, at the time the statutes against unlawful combinations in restraint of trade were passed, that was the only means or method of creating monopolies that had come into such common use as to be recognized as a public menace. While those statutes forbid "combinations and contracts" of certain kinds, they were forbidden, not because "combinations and contracts" were in themselves subjects for police regulation, but were forbidden merely as they might be used as a method or means of creating a monopoly, laws against monopolies being within the scope of ·police regulation. So it is in the case of the statute before us. Mere "discrimination" is not the thing aimed at, nor even "unfair competition," but the evil sought to be prevented is monopoly, and the Legislature is merely condemning that class of "discrimination and competition" which experience had taught the public

tended to bring about monopoly, and which was then being frequently resorted to for that purpose, and had become a public menace. But appellant says that "malicious competition," if an evil, is such under all circumstances, and, if it is to be prohibited at all, it must be by statutes reaching all methods, thus reaching all who are guilty of "malicious competition;" that otherwise there is an arbitrary and unreasonable classification of per- sons upon whom the law operates. If such position is sound, then the laws enacted against combinations and trusts are uncon- stitutional for the same reason, and the same plea could be raised against them that they did not reach all who were guilty, that, in- asmuch as the object of such laws was to prevent monopolies, and there being many other means by which monopolies could be created—such as the different kinds of unfair competition—such laws are unconstitutional; it being arbitrary classification to at- tempt to say to the man who enters into a combination in restraint of trade, "You are guilty of seeking to obtain a monopoly," while at the same time saying of the man who crushes his com petitor, and thus obtains a monopoly, "You may go free, as you are guilty of no offense."

It is not for the courts to say whether the Legislature has passed a wise law, or whether they should have made it more broad. With shrewd advisors to point out to their clients new methods by which monopolies may be obtained without breach of existing laws, it may happen that the Legislatures will soon see the necessitiy of passing new legislation reaching the conditions suggested by appellant in illustrations "a," "b," and "c," above referred to. That is for the Legislature to determine. Experi- ence, so far, has taught us that, while such acts set forth in "b" and "c" may be morally wrong, there is no great public menace from the same, for the reason that parties do not so frequently resort thereto under the circumstances suggested, owing, perhaps, to the certainty of immediate loss and the uncertainty of the parties being able to recoup such loss. Legislatures therefore have disregarded any public danger from such conditions, and have left the individuals to their remedy on the civil side of the courts.

Human experience taught that there was much greater danger to the public when three or more persons acted together in the unlawful use of force and violence than when only one or two committed the same acts. The result was that the Legislature passed the statute prescribing what constituted a riot. Under the provisions of our statute, if three or more persons acting together and carrying deadly weapons should commit an assault, they could be punished by 10 years' imprisonment, and this, even though the weapons were not used in making the assault, yet, if one or even two persons carrying such weapons committed an assault identical in nature, they could only be punished by a fine of $100, or 30 days in jail, or both. Was it wise to draw the line at three men, and make such a distinction? The Legislature thought it was, and could any defendant charged with riot say that the law was unconstitutional; that there was an arbitrary classification in that it made it a greater crime for one to act with two or more than for one to act alone or with one other? Again there can be no conspiracy without there are two or more engaged therein, but would our statutes defining criminal conspiracy have necessarily provided that when two conspire to do a wrongful act, it should be a crime, or could not the lawmakers, if they had thought best, have placed the number at three or four, or any other number? It seems to us perfectly clear that the same legal proposition is involved in the statute at bar and in statutes such as those relating to riot and conspiracy. There is no classification as to persons, but rather a limitation and specification of the elements and acts, surroundings, or conditions, with the wisdom or propriety of which courts have nothing whatever to do.

The plea of appellant in its final analysis is: "I am guilty of the acts condemned by your lawmakers, but there are other rascals who do these same things by other means, and you cannot punish me unless you punish them." The acts condemned by this statute do not reach the sole dealer mentioned in appellant's illustration "a," because it would be impossible for him to commit the offense; it does not reach those mentioned in "b" and "c" because, fortunately perhaps for them, whether wisely or not, the

Legislature has not barred at least one door through which wrong may enter, though such bars as it has erected bar all alike.

This brings us to the next point raised in appellant's brief, to wit: "The act is invalid because the classification of corporations by section 2, and the procedure therein provided for, is violative of the Constitution, both state and federal." The appellant has argued at great length that the law cannot punish the corporation differently than it punishes an individual, and contends that this law before us attempts so to do. It seems to be very much wrought up over the alleged fact that upon domestic corporations there is imposed the "death penalty," and upon foreign corporations "banishment," in addition to the punishment provided against individuals. Again, it seems to us, the appellant has entirely failed to recognize the questions of law involved herein. What it claims to be an additional penalty imposed against the corporation is really the voluntary forfeiture by it of its franchise or permit, the statute containing a provision for the determination by the proper court whether in any case, the implied contract existing between it and the state has been broken and its right to existance forfeited. Let it not be understood that this court admits that there can be no different punishment for a criminal offense imposed against a corporation than that imposed against an individual. We are of the opinion that there can be such a classification of punishment, the same as there can be different punishments imposed as against different individuals, if such distinction in punishment is based upon reasonable grounds, having relation to the crime and nature and condition of parties. People ex. rel. Duntz v. Coon, 67 Hun, 523.

A complete answer to appellant's contention regarding forfeiture being an additional punishment and unconstitutional, is found in section 20, art. 17, of the Constitution of this state, hereinbefore quoted in full. An examination of such section will show that, in the class of cases covered by such section, the Legislature is not only fully authorized to enact a law like section 2 of the statute before us, but is directed to do so in certain cases; and, whether or not the wrongful acts set forth in section 1 of this statute are sufficient to justify the Legislature, under said consti-

tutional provision, in the enactment of section 2 of this statute, is certainly a matter peculiarly within the right of the Legislature to determine; and having by the passage of this section determined that the doing of the acts forbidden are sufficient to warrant the forfeiture of the franchises and permits of corporations, there is nothing left to the court but the absolute duty to inforce such provisions of said section.

But regardless of said section 20 of article 17 of the Constitution of this state, there can be no question of the constitutionality of the section now before us. While it is true that corporations are entitled to the equal protection of the law, yet there is one thing that we should never loose sight of—the inherent rights of a corporation are entirely separate and distinct from those of a natural person. A natural person does not seek entry into this world, and he is born into the world with all the inalienable rights of a man, rights not given him by any earthly power, but by his Creator; which rights he retains undiminished, except in so far as he may surrender them for the good of the public, and which rights governments are instituted to secure. A corporation comes into existence through its own volition and upon its own seeking; it has not even the right of existence inherent in itself; it has only such rights as man gives to it. As was said by Justice Brown in Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370.: "Upon the other hand, the corporation is the creature of the statute. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and limitations of its charter." In brief, man was not created for corporations, but corporations were created for man; and the only excuse that can ever justify the creation of this artificial person is that through it the public shall receive some benefit. As was said by Justice Weaver in McGuire v. C., B. & Q. R. Co., 131 Iowa, 367, 108 N. W. 911: "The destinction between them is fundamental and ineradicable. The natural person has certain inalienable rights for which he is not indebted to organized society. He is born to them. The constitution and the laws recognize them, and provide safeguards for them, but do not create them. The corporate person has

no rights except those with which it is endowed by the law making power, and the power of creation necessarily implies the power of regulation."

At the creation of every corporation, in consideration of the rights and powers given to it by the state, there is the implied covenant or agreement, on the part of such corporation, that it will use the powers given it to the benefit of the public; and, as an incident to such implied agreement, there is attached the condition that, in case of a serious breach of such implied covenant and agreement, the corporation shall forfeit its right to exist, it having ceased to be of public benefit. So by the common law it was early recognized that corporations may forfeit their charters by the misuser thereof. It was also a part of the common law that, while corporations so forfeit their charters, such question of forefeiture could not be raised collaterally, and that, in order to make such forfeiture effective against the corporation, it was necessary for some court to adjudge the forfeiture. Angell and Ames on Corporations (10th Ed.) § 774; 2 Kent's Com., *306, *313; Lumbard v. Stearns, 4 Cush. (Mass.) 60; Mumma v. Potomac Co., 8 Pet. 287, 8 L. Ed. 945; State v. Minnesota Central Railway Co., 36 Minn. 246, 30 N. W. 816. This forfeiture under the common law could arise only in case of some wrongdoing affecting the public, but it was not necessarily such a wrong as constituted a crime. The states recognized this right of forfeiture, and many, if not all, have passed statutes similar to that found in chapter 26 of the Code of Civil Procedure of this state. Section 571 of such Code, being one of the sections of said chapter 26, provides for an action by the state's attorney, in the nature of quo warranto, to annul the charter of a corporation upon certain grounds, among which is whenever such corporation shall "violate the provisions of any law, by which such corporation shall have forfeited its charter or articles of incorporaton, by abuse of its power." Under such a section it will be found that the courts have frequently adjudged forfeiture of franchises, and that, even in cases where the wrongful conduct of the corporation did not amount to a criminal offense.

An illustrative case is that of People of New York v. North

River Sugar Refining Co., which was tried at special term before Justice Barrett, who rendered an elaborate opinion therein. The defendant entered into a combination which, under the present law of this state, would be a crime, but does not appear to have been criminal under the then statutes of New York. It was clearly a combination in restraint of trade. An action was brought to have declared forfeited the charter of such corporation, such action being brought under section 1798 of the then Code of Civil Procedure of New York (said section being similar to our Code, above referred to) the state claiming under two provisions thereof, to wit: First, because defendant had abused its powers; and, second, because it had exercised privileges or franchises not conferred upon it by law. In passing, it is well to note that we have a statutory provision covering this second ground. The opinion at Special Term is found in 54 Hun. 355, 401, 2 L. R. A. 33. The court found that the corporation had forfeited its charter, and among other things said: "Mr. Morawetz states the rule with precision (2 Morawetz, Corp. § 1024): 'A corporation may incur a forfeiture of its franchises by the doing of an illegal act. Any act of a corporation which is forbidden by its charter, or by a general rule of law, and strictly every act which the charter does not expressly or impliedly authorize, is unlawful; and, if the doing of such act is an injury to the public, it may be sufficient ground of forfeiture.' The same rule is laid down in Kent, Taylor, Waterman, Lyd, Angell & Ames, and Green's Brice. Kent, 312; Taylor, §§ 289, 457, 459; Waterman, § 427; Lyd, § 479 et seq.; Ang. & A. §§ 774, 775, 776; Green's Brice, 708, 709; Id. (3d Ed.) 787. Waterman says that: 'The state is not required to prove an actual injury; it is sufficient cause for forfeiture if the act be such as in the nature of things is calculated to produce injury.' The cases all hold the same doctrine, laying down the general rule that the corporate privileges shall not be abused; that the corporation undertakes and agrees, upon condition of forfeiture, that it will so manage and conduct its affairs that it shall not become dangerous or hazardous to the safety of the state or community in and with which it transacts business (Ward v. Farwell, 97 Ill. 593); and that the franchise may be forfeited and

the corporation dissolved for acts ultra vires, or for a breach of the trust condition and perversion of the objects of the grant. (Chicago L. Ins. Co. v. Needles, 113 U. S. 574, 5 Sup. Ct. 681; People v. Dispensary & H. Society, 7 Lans. (N. Y.) 306; People v. Bristol & R. Turnpike Road Co., 22 Wend, 235; People v. Fishkill & B. Pl. Road Co., 27 Barb. 445; State v. Milwaukee, L. S. & W. R. Co., 45 Wis. 590; Chesapeake & O. Canal Co. v. Baltimore & O. R. Co., 4 Gill & J. 1 (Md.) 106, 121). These rules rest upon the inherent right of sovereignty. The franchises, whether resulting from general or special laws, are grants from the sovereignty of the people. Benefit to the country at large, from the objects for which the corporations are created, constitute the consideration, and in most cases the sole consideration, of the grant. Chief Justice Marshall in Dartmouth College v. Woodward, 17 U. S., 2 Wheat. 518, 637, 4 L. Ed. 629. It therefore, follows logically that when those objects are perverted, when the country suffers injury instead of receiving benefit, the state, because of such misuser, may withdraw the privileges and resume its franchises." This case came before the full Supreme Court of New York, wherein the decision was rendered by Justice Daniels, and is found in 54 Hun. 354, 5 L. R. A. 386, which decision in all things affirms that at Special Term. It was then appealed, and in 121 N. Y. 582, 24 N. E. 834, 9 L. R. A. 33, 18 A. S. R. 843, is the opinion of the Appellate Court, affirming the decision of the Supreme Court, basing its affirmance solely upon the second ground set forth in the information, and in no manner passing upon the question of misuse.

Several of the states, in passing laws against combinations in restraint of trade, have specifically provided that the state's attorney or Attorney General should have power, and it should be his duty, to bring action for annulment of corporate franchises where the corporations are charged with doing the acts forbidden, thus putting those statutes exactly upon the same standing as the statute at bar; and the discussions found in the decisions of these cases all show that the remedy thus provided for is purely civil in its nature; that it is not in the least in the way of a penalty or punishment for a crime, but merely that the courts may adjudicate

whether or not the corporation has forfeited its right to exist. Distilling and Cattle Feeding Co. v. People, 156 Ill. 448, 41 N. E. 188, 47 A. S. R. 200; State v. Shippers, etc., Co., 95 Tex. 603, 69 S. W. 58; State v. Schlitz Brewing Co., 100 Tenn. 715, 59 S. W. 1033, 78 A. S. R. 941; New Orleans Waterworks Co. v. Louisiana, 185 U. S. 336, 22 Sup. Ct. 691, 46 L. Ed. 936; Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 20 Sup. Ct. 518; State v. Standard Oil Co., 61 Neb. 28, 84 N. W. 413, 87 A. S. R. 449.

We would call special attention to the case of State ex rel. Kohler v. Cincinnati, W. & B. R. Co., found in 47 Ohio St. 130, 23 N. E. 928, 7 L. R. A. 319, the act complained of not appearing to be a crime, but it being charged that there was a misuse of the franchise. The act complained of was the giving by a railroad company to one shipper of crude oil a different rate than was given to another, by the providing of a certain rate where oil was shipped in a tank car, and a greatly different rate per gallon where oil was shipped in car load lots in barrels. We desire to quote briefly from this case, as it bears directly upon a point hereinbefore discussed in this opinion, to wit, that there is more than one way of creating a monopoly; that it is not essential that there be any combination between individuals or corporations. The court says: "The justification interposed is that this was not done pursuant to any confederacy with the favored shippers, or with any purpose to inflict injury on their competitors, but in order that the railroad companies might secure freight that would otherwise have been lost to them. This we do not think sufficient. We are not unmindful of the difficulties that stand in the way of prescribing a line of duty to a railway company, nor do we undertake to say they may not pursue their legitimate objects, and shape their policy to secure benefits to themselves, though it may press severely upon the interests of others; but we do hold that they cannot be permitted to foster or create a monopoly by giving to a favored shipper a discriminating rate of freight. As common carriers, their duty is to carry indifferently for all who may apply, and in the order in which the application is made, and upon the same terms; and the assumption of a right to make discriminations in rates for freight, such as was claimed

and exercised by the defendants in this case, on the ground that it thereby secured freight that it would otherwise lose, is a misuse of the rights and privileges conferred upon it by law."

. We think, therefore, that it will readily be seen, and must be admitted, that provisions such as section 2 of this act are constitutional, because if not, then our general statute providing for actions to declare forfeiture of franchises would be unconstitutional, in that it would have to be held that such statutes also adds a penalty for a crime committed by a corporation other than that provided in case the defendant is a natural person. It must be conceded that, if it is within the legislative power to enact such statutes separate and distinct from the criminal statutes, there can be no grounds for claiming that it is unconstitutional simply to combine them in the same statutes under separate sections, as has been done by so many of the states under their statutes regulating trusts and combinations. We might suggest that this ground of unconstitutionality now under discussion seems never to have been raised in any of the cases we have cited arising under these anti-trust statutes, from which we conclude that the fact that these provisions are constitutional is universally conceded. Such a provision is found in the statute under consideration in the case of State v. Drayton, and in that case the question now before us was not raised.

Sections 1 and 3 of this act, if standing alone, would make a complete penal statute; and if section. 2 had been omitted, there is no doubt but that the remedy provided for by section 2, could have been obtained under the general statute providing for actions to annul charters, at least against domestic corporations, and, if such general statute is not broad enough to provide for action against foreign corporations, there can be no question but under the common law such action could have been brought, and this, regardless of the fact that defendant had not been convicted under section 3. How, then, can it be held that section 2 is unconstitutional, when no one will claim the general statute not to be constitutional? It is therefore clear that the Legislature had every power to declare the forfeiture, and to direct the Attorney General to bring this class of actions. The Legislature also would

have the power to provide the method of procedure set forth in section 2, for all cases under any of the grounds specified in the general statute above referred to; and if, therefore, for any reason, the Legislature has seen fit to provide such procedure, applying it to cases where the corporations are charegd with some particular misuse of their franchise rights, such corporations surely cannot claim that such peculiar procedure, because applying only to that particular misuse, is for that reason unconstitutional, especially if, as in the case of the procedure provided for in section 2, it is peculiarly applicable to the conditions confronting the investigation of such alleged misuse.  It will be noted that the only power given to the Attorney General in investigating a complaint under such section 2 is to subpoena witnesses, administer oaths, take testimony, and require a production of books or other documents.  It does not specifically provide that he can require the accused to produce its books or documents or give testimony, and if such requirements, if contained in the statute, would be unconstitutional, it would then be our duty to so construe the statute at bar to limit this right to the production of other books and documents and the calling of other witnesses. But it is clearly within the power of the Legislature to provide that a defendant may be required under proper penalties, to produce its books and documents, for the reason, as hereinbefore stated, that this proceeding is purely civil in its nature.

The appellant has cited the case of Phipps v. Wisconsin Central Railway Co., 133 Wis. 153, 113 N. W. 456, contending that said case is an authority in support of its position; that the provisions in section 2 as to procedure are unconstitutional, in that they apply only to corporations, and not to persons' or partnerships.  A reading of said case will show that it has no bearing on the point involved herein, for the reason that, as the action provided for in section 2 is an action against a corporation, and it would be impossible for there to be a proceeding for like purpose against a natural person, there is no infringement of any constitutional right providing such procedure.  Consolidated Rendering Co. v. State, 207 U. S. 541, 28 Sup. Ct. 178; Hammond Packing Co. v. State of Arkansas, 212 U. S. 322, 29 Sup. Ct. 370.

This last case was similar in nature to an action to annul the charter of a corporation; it being brought under a statute providing for recovery, in a civil action, of a penalty for violation of an anti-trust act of the state of Arkansas. This act has most elaborate provisions in relation to matters of procedure, which provisions, as applied to corporations, were as drastic as can be found in the statute of any state. We will not undertake to state the provisions of such statute, nor to quote from such decision, but will say that, to our mind, it covers fully the questions here raised by appellant, based upon the provisions in section 2 relating to method of procedure.

In closing this branch of the case we refer again to the case of State v. Standard Oil Co., supra, which involved the construction of an anti-trust statute. The first section of such statute defined a trust; the second prescribed a punishment therefor; the third declared a violation of the statute by a corporation to work a forfeiture of its charter, and that it might be ousted by quo warranto; the fourth provided that all foreign corporations or persons not resident of the state violating the act should forfeit their right of doing business within the state, and that it should be the duty of the Attorney General and county attorney to enforce such provision by injunction, or by other proper proceedings. This act was attacked as unconstitutional, and the court said: "In construing an act of the Legislature all reasonable doubts must be resolved in favor of its constitutionality. If sections 3 and 4 provide penalties for crime, they violate the Constitution, and are absolutely void, for they deny the right of trial by jury (Const. art. 1, §§ 6, 11; State v. Moores, 56 Neb. 1, 76 N. W. 530), and the right to a trial on an indictment or information (Const. art. 1, § 10). Furthermore, a corporation can violate the law only by transgressing section 2. That section declares the penal consequences of the transgression, and it would not be competent for the Legislature to add another penalty and enforce each by a separate action. Const. art 1, § 12. The true construction of sections 3 and 4 is that they are merely declaratory of the common law, and that they provide for ousting corporations by civil action from the exercise of powers and privileges which have

been abused. The action is no more criminal than is an action for damages resulting from the commission of a crime. Waters-Pierce Oil Co. v. State, 19 Tex. Civ. App. 1, 44 S. W. 936. Section 4, so far as it relates to citizens of other states, is an unlawful discrimination in favor of the citizens of this state, and invalid in any view of the case. There is another reason why the motion should be sustained. Foreign corporations do business here, not by right, but by comity. Paul v. Virginia, 8 Wall. 168; Western Union Tel. Co. v. Mayer, 28 Ohio St. 521. The state grants them a privilege which it may revoke at pleasure. When they exercise their franschises in contravention of our laws, the privilege is revoked; and, that fact being ascertained, judgment may be rendered excluding them from the state. The revocation of the permission given a foreign corporation to do business here is not the infliction of a penalty; it is not the deprivation of a right. The privilege is like any other license, and the withdrawal or cancellation of it in consequence of the commission of a crime is not punishment in a legal sense. Martin v. State, 23 Neb. 371, 36 N. W. 554; Miles v. State, 53 Neb. 305, 73 N. W. 678; State v. Harris, 50 Minn. 128, 52 N. W. 387, 531."

The views herein expressed in relation to the constitutional questions raised render it unnecessary for us to discuss the next point raised by appellant, to wit, "whether the act can be severed, and some parts saved, while others are condemned."

The last contention made by appellant is that: "The act interferes with freedom of contract." Counsel for appellant frankly state that they avail themselves largely of the reasonings and authorities in the briefs filed in the Drayton Case, and we would feel fully justified in resting our decision solely upon the reasoning of the court in the said case, and upon what has been hereinbefore stated, which tends to bear upon this question. It will be seen by a study of this statute that it in no manner restrains the defendant from the making of any contract that is morally right and just. It does not even forbid the defendant from fixing prices for the express purpose of destroying competition, providing the defendant fails to discriminate between different points.

When the permit was given to this corporation to do business within this state, the state did not surrender its lawful police authority, and therefore the corporation took this right or franchise subject to the same restrictions imposed upon natural persons, and was thus required, and it impliedly agreed, to exercise its franchise in conformity with such police regulations as might at any time be lawfully adopted. In the case of State v. Schlitz Brewing Co., supra, the court said: "In further refutation of the mistaken assumption that every citizen has an unrestricted right to acquire and dispose of property by such contract as he may choose to make, we quote the Supreme Court of the United States as follows: 'It would be idle and trite to say that no right is absolute. Sic utere tuo ut alienum non laedas is of universal and pervading obligation. It is a condition upon which all property is held. Its application to particular conditions must necessarily be within the reasonable discretion of the legislative power.' Orient Iron Ins. Co. v. Daggs, 172 U. S. 566, 19 Sup. Ct. 281, 43 L. Ed. 552."

Before closing we wish to add a few words to what we have already said in relation to the point that the acts forbidden tend toward the creation of a monopoly, and that for that reason the statute comes within section 20, art. 17, of our Constitution. Human experience certainly teaches that men are usually controlled by some motive, either laudable or otherwise, in their business transactions with their fellow men; and, when the public, as in the case at bar, sees any person or corporation establishing a radically different price at a point of competition from that fixed at another point, it is the natural conclusion, based upon human experience, that such party has some ulterior motive, that he is not fixing such prices out of any feeling of kindness toward the people of such community, but that he expects eventually to obtain benefit therefrom; and it is therefore the conclusion of the public that it is the motive of such wrongdoer to drive the competitor out of business, and thereafter recoup such loss as he may have suffered during said process of destruction by an increase in price after a monopoly has been acquired. As was well said by the Supreme Court in People v. North River Sugar Refining

Co., supra: "And after putting forth the efforts necessary to secure that end, it would not only be idle, but absurd, to indulge in the supposition that it was not intended to wield the authority, in this manner secured, for the pecuniary advantage of the associates. And the direct and usual way in which that is accomplished, following out the common impulses of practical business men, is by the advancement of the prices · of the commodities manufactured and sold, in the course of the business whose control may be in this way secured. When the opportunity to do that is provided, human selfishness is sure to turn it to a profitable account." Surely it cannot be successfully contended that the state has not the power to prevent the consummation of such wrongful motive simply because, by so doing, it would impair the constitutional rights of any person, natural or artificial, to freely contract.

Summarizing all we have said herein: The lawmakers of this state, taking notice of a business practice known to all men, and which had grown in rapid strides during past years, until it was threatening the welfare and liberties of a free people by its tendency to create monopolies in the articles of commerce, thus leaving the consumers the helpless prey to the avarice of the holders of such monopolies, passed the law in question to · cure the above-mentioned evil; the law is sufficient in form as a criminal statute, as it set out clearly the acts condemned as wrongful, and forbade the same by providing a penalty for the doing of such acts; it is also sufficient in form as a civil statute designed to declare a forfeiture of corporation franchises and licenses in case of misuse of such franchises and licenses by the doing of the wrong condemned; it provides a method of procedure to have such forfeiture adjudicated, practical and consonant with the end in view; it brings under the purview of the criminal provisions every person, partnership, and corporation in existence, and under the civil provisions every corporation, domestic and foreign, and is therefore free from any attempt at classification of persons covered thereby; its civil provisions are in no sense a penalty for the crime, but a provision directing the proper tribunal to determine whether the corporation had broken its contract with the

state, and they therefore do not impose a greater punishment upon corporations than upon natural persons; it in no manner interferes with full freedom of contract, except in so far as is proper and necessary to prevent wrong to the state and its subjects.

The order of the trial court sustaining the demurrer in the civil case is affirmed, as is the judgment of said court and order denying a new trial in the criminal case.