## COMPETITIVE BIDDING FOR MUNICIPAL SUPPLIES.

Common Pleas Court of Cuyahoga County.

GEORGE J. MOG AND THERESA A. MOG v. THE CITY OF
CLEVELAND ET AL.

Decided, June 11, 1915.

*Municipal Corporations—Principle of Competitive Bidding Must be
Held Inviolate—And Has Been Carried Into the Cleveland Charter
—Specifications Inadmissible Which Are so Drawn as to Admit of
Goods Manufactured by Only One Concern—Injunction.*

1. The principle of competitive bidding in the purchase of supplies is
   of such importance to the well being of a municipality, and is so
   imbedded in the law of the state, that reason for departing there-
   from in a particular instance is not afforded by the fact that some
   inconvenience or loss will be incurred by adherence thereto.
2. This principle has been incorporated into the new charter of the
   city of Cleveland, granting powers of local self-government; and,
   under said charter, the adoption of plans and specifications for a
   public improvement which restrains free competitive bidding by
   requiring the exclusive use of any article which is controlled by a
   single person, firm or corporation, is prohibited.
3. Where it is shown by the testimony of the officers having the mat-
   ter in hand that in their opinion the desired equipment can not
   be secured through competition, but must be purchased from a par-
   ticular manufacturer, and it is frankly admitted that the speci-
   fications were so drawn as to make it impractical for any other
   manufacturer to submit a bid, injunction will lie against accept-
   ance of the proposal of the one manufacturer whose product cor-
   responds with the specifications upon which bids were asked.

*White, Johnson, Cannon & Neff,* for plaintiffs.

*Hoyt, Dustin, Kelley, McKeehan & Andrews* and *City Solici-
tors,* contra.

FORAN, J.

The plaintiffs, George J. Mog and Theresa A. Mog, as tax-
payers and residents of the city of Cleveland, filed a petition

in this court May 13, 1915, in behalf of the city and all taxpayers thereof, against the city of Cleveland, Charles W. Stage, director of public utilities, and the Babcock & Wilcox Company, a New Jersey corporation, praying that they be enjoined from doing certain things complained of in the petition.

It is alleged in the petition that the city of Cleveland has in process of construction a filtration plant on Division avenue, and in connection therewith is about to install a pumping station, for which it became necessary to purchase five steam boilers which the city determined should be water tube boilers; and that the specifications prepared by the defendant municipality and the defendant, Charles W. Stage, its director of public utilities, for said boilers were so drawn as to confine all possibility of competition to the defendants, the Babcock & Wilcox Company; and in fact were specifications exclusively for said company; and that the advertisement and specifications sent to other competitors or manufacturers of steam boilers purporting to afford or give opportunity for competition were so in form only—a mere pretense and idle ceremony; for it is claimed that under the specifications the Babcock & Wilcox Company alone could commercially conform to the specifications as drawn and prepared. In fact it is broadly stated and claimed that the specifications in fact and in effect called for and prescribed a type of boiler made or manufactured only by the Babcock & Wilcox Company.

It is further claimed in the petition, and was strenuously insisted upon during the hearing, that the Babcock & Wilcox Company being especially equipped to manufacture the types of steam boilers prescribed and named in the specifications, other manufacturers of steam boilers could not successfully compete with said company, and declined to submit bids, and that the bid of the Babcock & Wilcox Company of $43,000 was the only bid submitted and that the board of control of the city of Cleveland has approved, this bid and is about to enter into and execute a contract with the said Babcock & Wilcox Company for said steam boilers.

The prayer of the petition is, that the defendants, the city of Cleveland and Charles W. Stage, as director of public utilities, be enjoined from executing said contract, and that the Babcock & Wilcox Company be enjoined from doing any act under or by virtue of said contract.

The joint answer of the city of Cleveland and Charles W. Stage, director of public utilities, admits the city of Cleveland has adopted a charter as alleged in the petition; that the city has in process of construction a filtration plant, for which five water tube boilers are necessary, and that by the city's specifications therefor it was provided that bids would be received only on water-tube boilers having tubes directly connected with steam drums or with boilers having tubes expanded into sectional headers which connect with water and steam drums. But it is averred that these stipulations permitted the widest and freest competition. It is admitted that the Babcock & Wilcox Company is a manufacturer of the two types of boilers mentioned in the petition and provided for in the specifications of the city; but it is insisted that the same are obtainable in a wide market in forms differing, as made by the various manufacturers thereof, in workmanship, material, efficiency, facility and economy of operation.

The city further avers that it is informed by the Babcock & Wilcox Company that certain patents on its said boilers have expired. It is admitted that the board of control of the city of Cleveland has accepted the bid of said Babcock & Wilcox Company and awarded said company the contract, and that said contract will be executed and carried into effect unless the same is prevented by this court. Further answering, the city and the said Stage deny each and every other allegation in the petition.

The answer of the Babcock & Wilcox Company, except for the necessary details to make the answer applicable to that company, is practically identical with the answer of the city of Cleveland and Charles W. Stage, director of public utilities.

There are allegations in the petition to the effect that the city of Cleveland has adopted a charter, and that this charter

provides that in making purchases above one thousand dollars, the same shall be made by competitive bidding or after proposals have been received through competitive bidding.

Sections of the charter in relation to competitive bidding and the ordinances of the city passed thereunder will be referred to hereafter.

To better understand the questions involved, a few general observations on steam boilers may not be inappropriate.

A steam boiler is simply an appliance whereby potential energy of the fuel used is converted into a force or energy through or by which mechanical work is performed by means of a steam engine. Its essentials are a receptacle containing the water and the steam produced by evaporation, a furnace for burning the fuel, and a sufficient heating surface to evaporate the water and produce the steam required for any given installation.

The efficiency of the boiler depends upon many considerations, one witness declaring that as many as twenty-five or more essentials or conditions should be taken into account in order to secure the highest efficiency. These we think can be reduced to four or five; at least all the conditions may be included in that number.

High efficiency simply means the largest amount of steam that can be produced in proportion to the amount of fuel consumed, and for such efficiency "completeness of combustion of fuel must be combined with sufficient heat surface to absorb so much of the heat produced as will reduce the temperature of the funnel gases to nearly that of steam." To attain this end the amount of air admitted to the furnace is quite important, it being generally conceded that much more air must be admitted than is theoretically necessary to oxidize the combustible portions of the fuel; and this again depends upon the kind and character of the coal or other fuel used. Then, again, much depends upon the draft, natural or forced, and the mechanical stoking employed.

Boilers may be divided into two distinct classes or types, the tank and the water tube. With the former we are not concerned,

except to say that in this class the water surrounds the fire or hot gases, while in the tube boiler the fire or hot gases surround the water.

There are many types or classes of water tube boilers, all of which it is claimed develop high efficiency, each maker contending that the type or class made by him is unqualifiedly the best. We will only refer to three of these types, and necessarily in the briefest manner, because we think the other types are practically excluded by the specifications.

The Babcock & Wilcox boiler is a well-known and largely used boiler, capable of high efficiency, and of acknowledged serviceability. It "consists of a horizontal cylinder forming a steam chest, having dished ends and two specially constructed cross boxes, riveted to the bottom. Under the cylinder is placed a sloping nest of tubes, under the upper end of which is the fire. The sides and back of the boiler are enclosed in brick work up to the height of the center of the horizontal cylinder, and the front is fitted into an iron casing lined with brick at the lower part. Suitable brick work baffles are arranged between the tubes themselves, and between the nests of tubes and the cylinder, to insure a proper circulation of the products of combustion which are made to pass between the tubes three times. The nest of tubes consists of several separate elements, each formed by a front and back header made of wrought or forged steel of sinuous form connected by a number of tubes."

There are many other details, including water feed and appliances for superheating the steam, and more of minor importance.

It is claimed that any desired working pressure can be provided for in these boilers, rising in some special cases as high as five hundred pounds per square inch, but the more usual pressure is one hundred and eighty pounds. This is known as the sectional header type of boiler. In some of these types the sectional header is not sinuous.

The Sterling type "consists of four horizontal drums, of which the three upper form the steam and water space, the lower con-

taining water alone.  The lower drum is fitted to the upper drums by numerous nearly vertical tubes, which form the major portion of the heating surfaces.  The central upper drum is at a slightly higher level than the others, and communicates with that nearest the back of the boiler by a set of curved tubes entirely above the water level, and with the front drum by two sets—the upper one being above and the lower below the water level.  The whole boiler is enclosed in brick work, into which the supporting columns and girders are built.  Brick work baffles, four in number, compel the furnace gases to take specified courses among the tubes.''

There are many other details, including arrangements for super-heating and water feed, which do not demand special attention or mention, as all makes or types include such details.

In this boiler five drums may be used, two at the bottom suitably connected, and three at the top, as above indicated.

This boiler, it is and must be admitted, is capable of high efficiency, is in general use, and has given uniform satisfaction.  Both these classes or types were patented, but it is said the patents have expired.  It is admitted the patents have expired on the boilers as originally placed upon the market or used in the trade, but it is insisted by the plaintiff that patents have been applied for for improvements on the Sterling boiler, the claim being confined, however, to the baffling arrangement.

The Badenhausen type of boiler is patented, and as it has been upon the market but a few years, an impartial description of its details by impersonal authors and writers on steam and boilers is not available.  As described by the patentee, it ''consists of two water drums and two steam drums.  The two water drums and the rear steam and water drum are connected by means of tubes, so as to form a perfect cycle of circulation for the water.  The steam drum is connected through the water column opening to the lower front drum.  The boiler is supported by heavy steel framing, which consists of I-beams, in which case the rear steam and water drum rests upon horizontal I-beams.  The water drum is suspended from heavy turned bolts

secured to these I-beams, and the mud drum is suspended from the tubes which are connected to the rear steam and water drums. The front water drum is supported from the frame by means of bolts. The mud drum is suspended from the tubes, giving, as the patentee claims, perfect flexibility, so that whatever the variations of temperature may be in the boiler, there is no liability of tubes being distorted or torn out from the drum.''

Of course, there are many other details, including water feed, super-heating and brick work man-holes, character of structure, and material used.

Many claims are made for this boiler, the principal claims being that it has ''the most perfect type of circulation.'' In a word, that the circulation is positive, continuous and unrestricted. It is also claimed that it has more disengaging surface; that is, more total area of tubes discharging into the rear drum; that it has greater flexibility than other boilers, and that the steam while passing through the steam tubes is more thoroughly dried and super-heated, and thus the difficulties contingent upon using saturated steam avoided.

There is, or can be no doubt but that superheated or dry steam is an essential factor in the efficiency of boilers. Any vapor in contact with the liquid from which it is formed, if both are in thermal equilibrium, is necessarily saturated, and in this condition it is not a perfect gas. The more steam is superheated the more nearly its properties approach those of a perfect gas, the greater its volume as compared with water, and the more pressure it exerts; and besides the evils contingent upon carrying water into the engine's cylinders is wholly obviated. If a steam engine is considered as a thermo-dynamic appliance whose function is to secure the greatest possible amount of work from a given quantity of fuel or heat, it will be seen that superheated steam is of prime importance. The Badenhausen people make large claims in this respect, as well as in other respects; but even if we should largely discount all the claims made for the Badenhausen boiler, we think the testimony fairly if not conclusively demonstrates that it is just as good a boiler and capable of as

high efficiency as either the Babcock & Wilcox sectional sinuous header or the Sterling type of boiler. Indeed, if the testimony is to be believed, it is quite probable that in some respects it is superior to these types. Many firms manufacture what is known as the solid header type, which it is claimed is just as efficient as the sectional header type. It is frankly admitted by the defendant municipality that this type (solid header) is excluded by its specifications.

It is not essential or necessary to the inquiry before us or the questions under consideration to hold that this type was improperly excluded from competition. During the hearing this type was loosely termed a water leg boiler. A water leg is a vertical water space connecting other water spaces and crossing a flue space by which its contents are heated. It must be conceded that the tube to drum and the sectional sinuous header types are steps in advance of the water leg, especially in installations where as high as 500 prime mover units are required; and we think the city was justified in excluding that type; but if the makers of these types could manufacture the types called for by the specifications, there is certainly no reason why they should not be given full and free opportunity to do so.

Clause 5 of the specifications reads:

"Bids will be received only on water tube boilers having tubes direct connected with water and steam drums or with boilers having tubes expanded into sectional headers which connect with water and steam drums."

It will be seen at a glance that this paragraph excludes all types of boilers except the tube to drum and the sectional header types.

It is not claimed by the plaintiff that the municipality had no right to specify these types, provided the principle of competition was not invaded by restrictions as to the time within which proposals would be received, except in so far as it is claimed that by specifying the type of boiler which has been made or manufactured by one firm exclusively, other firms or competitors

necessarily are at a disadvantage in endeavoring to compete with such firm on its special type of boiler. The specifications were mailed on April 1, 1915, to some seventeen different makers of boilers. By clause 1 it is provided that sealed proposals "will be received at the office of the commissioner of purchases and supplies, 511 City Hall, until 12 o'clock M. April 15, 1915, and will be opened immediately thereafter.

Clauses 8, 9 and 10 provide substantially as follows:

"Each proposal must be accompanied by plans drawn accurately to scale, showing the complete assemblage of the boilers required and equipped with mechanical stokers and the necessary brick work."

It is further provided that the plans shall include side and front elevation, longitudinal and cross sections through one boiler showing superheater, stoker, brick work, baffling, and specify all tubes. Indeed, it may be said in a general way that the plans and drawings submitted with each proposal must contain all the data necessary to enable the board of control or the commissioner of water to determine whether the proposal corresponds accurately to every possible part of the specifications.

It will be noticed that only fourteen days are given in which to prepare all these plans, blueprints, drawings and data. If it is true, as claimed by the plaintiff, that the types selected or specified are only made by the Babcock & Wilcox Company, it need hardly be said that that company had an advantage over all other competitors so far as furnishing these drawings, blueprints, plans and data is concerned. It appears in evidence, and is not denied, that this company is the largest and no doubt the best equipped manufacturer of steam boilers in the United States. It supplies a very large part of the trade, makes over eight hundred classes, types and sizes of boilers, and has on hand drawings, plans and blueprints for any kind, type or size of boiler for any installation heretofore known. It is strenuously insisted, and not seriously controverted, that no maker of boilers but the Babcock & Wilcox Company could furnish the drawings,

plans and data demanded by clauses 8, 9 and 10 in fourteen days after the specifications were received; and if the specifications had to be mailed to far distant localities, the time might be less than twelve days, or even less, excluding Sunday. In this connection it must be remembered that the boiler business, like all other kinds of manufacturing, is more or less affected by the general tendency to specialize along certain lines. The growth and improvement in machine tools and diminished hand work must be considered. Every distinct operation on almost every section of a boiler may be accomplished by a highly specialized machine and repetitive operations superseded by templeting, which has reached such a state of perfection that the evils of drifting are no longer dreaded by either the manufacturer or the purchaser of boilers. It is in evidence that one machine to make sectional sinuous headers costs the Babcock & Wilcox Company $250,000. This must necessarily be a highly specialized and very complicated machine. If a thousand boilers are made in a year, each plate, hole and flange will be alike in each. The dimensions of plates, tubes and drums for any kind or size of boiler will not only be known, but the parts will also be kept in stock and ready to be assembled. It is for this reason that competition is endangered when designs or types and not results are specified. These designs and types divide themselves into classes adapted to almost any particular kind of installment, not only as to the number of prime mover units to be provided for, but also the space and character of the location where the installation is to be made. This becomes quite evident from the fact that the proposal of the Babcock & Wilcox Company, which was accepted by the board of control, provides for what is known as Class O No. 20 type of Sterling boiler. This is undoubtedly a standard type made by this company, and no new drawings or specifications were required. Therefore and for that reason it will be readily seen how difficult it would be for any other company to compete with the Babcock & Wilcox Company in designing a Class O No. 20 standard type of Sterling boiler. It may be said, however, that results are required of or from the design

or type specified, but the evil arises from practically excluding results guaranteed by the makers of other designs or types.

While it is admitted that any properly equipped boiler shop may make any type of boiler that may be designed, it must be conceded that no man can commercially compete with another man on the type of boiler in the building of which the latter has specialized for a number of years, and for the reason that his machinery and templeting may be specially adapted and his workmen specially skilled or trained to produce that type of boiler. It may be said that the man who has so specialized, because of such specialization and the necessary equipment therefor, can sell his product or type at a lower price than the man who attempts to compete with him in his particular line. This is in a measure true, but the danger, however, is that, after he has obtained control of the market, he can fix the price to suit himself, as he is then no longer subject to competition, and the purchaser necessarily suffers. But there is a still greater danger to be apprehended from specifying types and designs. It in effect limits bidding to the man or corporation whose type or design is selected or specified; for, being peculiarly equipped to make the type called for, he is in such a position of advantage that others, knowing they can not commercially compete on the type specified, refrain from or refuse to bid or submit proposals, and thus the maker of the type specified has the field to himself, and naturally secures a higher price than he would if competition were possible. This becomes quite evident from the testimony in this case. The Babcock & Wilcox Company was the only firm that submitted proposals, and it is in evidence, and not denied, that one boiler manufacturer informed the board of control that if he were given an opportunity to bid, he could save the city ten thousand dollars.

Again, it is provided by clause 23 of the specifications that:

"In comparing the proposals submitted, that offering to complete the work in the shortest time will be taken as the standard, and an amount equal to fifty dollars multiplied by the number of days that each other bid is in excess of the time adopted as stand-

ard, will be added to the price stated in said bid to determine which is the lowest and best proposal.''

This simply means that if one firm offers to have the boilers ready and installed in fifty days, and another in one hundred days, there will be added to the bid of the latter the sum of $2,500; that is, $50 a day for the difference between his bid and the bid of the person offering to have the boiler installed in fifty days. Where competition is sharp, the sum of $2,500 is quite an item. It is no answer to this to say that the proposal submitted for the Division avenue pumping station was to have the installation complete within three days of the time specified, and this time was four months; for it is in evidence that on an installation for the Fairmount pumping station in this city in 1914, the proposal of the Babcock & Wilcox Company was to have the installation complete in fifty-three days, while the offer of the next bidder on the same type of boiler was to have the installation complete in 131 days, being a difference of seventy-eight days. The penalty in that case was $15 a day, but the sum of $1,170 was necessarily added to the proposal of the firm requiring the greatest number of days to complete the installation, and this sum, if that firm had been the lowest bidder, would have made it the highest bidder.

On this installation, that is, the Fairmount pumping station, there were four or five competitors, and the Babcock & Wilcox Company, knowing that there was competition, agreed to complete the installation within a less number of days than any other person or firm submitting proposals. So far as the Division avenue pumping station is concerned, the Babcock & Wilcox Company knew there was to be no competition, and it took all the time that it deemed necessary. If there had been competition, and this company knew that there would be competition, it undoubtedly would have agreed to complete the installation within forty or fifty days, because it is specially equipped to do so. While the number of men that may work upon the construction of one boiler is limited, the number of men that may work

upon five boilers may be five times that number. And besides, as has already been pointed out, the advantage of having designs for its various classes and types, special machinery and material in stock, can not be ignored.

In competitive bidding, the word competitive means pertaining to or involving competition; which means, as defined by the Century Dictionary, ''The act of seeking or endeavoring to gain what another is endeavoring to gain at the same time.'' If two persons are endeavoring to gain the same thing at the same time, the essence of competition requires that each shall be free to act and have equal opportunities to secure the object sought. If one is hampered or restricted by conditions that do not apply to the other, the principle of *laissez-faire* is invaded, and competition is destroyed. Competition and monopoly are precise and exact opposites, and anything tending to destroy competition inevitably tends toward monopoly. See *State* v. *Central Lumber Company*, 123 N. W., 504, at 512.

To avoid and escape the evils of monopoly, and the moral depravity it too often engenders, furnishes the real reason why the law, voicing the public will, demands as a *sine qua non* that purchases by municipal and *quasi*-municipal corporations involving expenditures above a prescribed sum shall only be made by or after competitive bidding. The common experience of men points unerringly to the fact that, to enable a consumer or buyer to obtain the best possible terms, there must be free competition in an open market. It is a maxim of the law of trade that the more facilities there are for exchange the greater will be the benefit to all concerned.

That competition has a salutary effect upon price will not be denied. The minimum price of an article is measured by the cost of production, while the maximum is measured by the profit that can be exacted or extorted by the producer. Much can be said in favor of the proposition that a buyer, even though a municipal corporation, should have the right of selection; but when the right of inclusion, as well as the right of selection, is insisted upon by a municipality, courts may interfere to prevent com-

bination; for, as has been well said, "Where combination is possible, competition is impossible."

The Sterling Boiler Company no longer exists. It was absorbed by the Babcock & Wilcox Company, and no doubt for the reason that the Sterling boiler came into sharp competition with the Babcock & Wilcox boiler, and that competition between the two had a tendency to lower prices on the classes of boilers made by the two companies; and it must be admitted that these classes of boilers are unquestionably of high efficiency. Having taken over the Sterling Company, the Babcock & Wilcox Company is so thoroughly, scientifically and mechanically equipped to manufacture these two classes of boilers that firms and corporations equipped only to make a different style or type can not, in the nature of things, commercially compete with that company.

In this connection, the language of the court in *Ampt* v. *Cincinnati et al.* 17 C. C., 516, is strikingly pertinent. In the case before the court, a peculiar and particular kind or type of pump was specified. In the opinion, page 521, the court say:

"The machinery required for this work is only capable of being built by ten firms in the United States. Of these, eight were bidders on this work. The difficulty that presented itself at once to the trustees in making the exact drawings and specifications of every part was this: Machinery of this magnitude has as yet not reached that state of perfection, and probably never will, where all builders build to any certain and fixed plan as to details. In this respect each builder has his own detailed plans, and no two are alike, and their tools and patterns are made to produce their own work after their own plans; therefore, if the detailed plans of this complicated work were to be given in all its parts, the trustees were either compelled to adopt the plans of one of the concerns which had produced such work, or else get up a plan of the same kind of their own. It will be seen at once that the object of the law would be defeated if the board were to adopt the detailed plans of any one of the firms, for this would virtually destroy all bidding by firms other than the one whose plan was adopted, and place the trustees at the mercy of that firm. The price to the city would in all probability be much greater than it should be. This would destroy competition in

bidding, the very thing the law was intended to bring about, and this must not be except from necessity.    *    *    *

"In the next place, no firm could construct such machinery so well or so cheaply as it could machinery of its own pattern and design. And then lastly, which is the most important of all, it would when completed be more or less experimental, and might not perform the work required of it."

Referring again to the specifications, we find that clause 42 provides:

"The boilers shall consist of horizontal and cylindrical water and steam drums, and inclined water tubes connected with the drums direct or by means of sectional headers."

Based upon factory equipment, this clause limits competition to the Babcock & Wilcox Company, and the Flanner Company of Akron, Ohio; and this latter company is excluded by clause 47, which reads:

"Each header shall be of the sinuous sectional type. Each section shall hold one entire vertical bank of tubes. They shall be made of open hearth forged steel, and shall be equipped with hand laid plates having the joints on the inside of the headers."

The Akron company make a cast steel sectional header type of boiler, and as clause 47 provides for a forged steel sinuous sectional header, to manufacture which the Babcock & Wilcox Company has provided special machinery costing $250,000, it will be readily seen no one can commercially compete with it in making that style of sectional header boiler. Much stress is placed upon the claim that forged steel is vastly superior to cast steel, for the reason, as the commissioner of water claims, that cast steel, owing to blow holes, is not as strong or durable as forged steel. He might have added that cast steel has other defects such as piping and segregation. As the "pipe" occurs at the end of the cast, this can be cut off, but the segregation, which is the tendency in cooling to drive to the center of the cast the impurities, can not be well eliminated. On the other hand, the uncontra-

dicted testimony of the plaintiff's expert witness, Professor Kidwell, shows that in the process of making the sinuous sectional forged steel headers by the Babcock & Wilcox Company, the steel is heated to incandescence from five to seven times. If this is true the quality of the steel must be impaired. Steel is only an arbitrary name for wrought iron, having a moderate carbon content of from one-third per cent. to two and one-fifth per cent. The carbon in the fuel used for heating wrought iron has so strong a carburizing action as to turn some of it into natural steel, and raising steel frequently to a high temperature, with the resulting cooling, in a fuel containing carbon, must have a tendency to still further carburize it and render it hard and brittle; so that what may be gained in using forged steel may be lost by this frequent heating and cooling. Hence the question of superiority as between cast steel and forged steel in sectional header boilers is still an open one, and Commissioner Schulz is not justified on this ground in excluding the cast iron header from competition simply because it may have blow holes and other defects.

Clauses 45 and 46 of the specifications read:

"Each boiler must be equipped with steam and water drums of ample size. The water space in the steam and water drums shall be not less than 220 cubic feet. The steam space in the steam and water drums shall be not less than 172 cubic feet.

"Separate mud drums are to be provided at lowest point of boiler, and they are to be made of the same quality of steel as the water drums."

By referring to the definition of a Sterling type of boiler, it will be seen that these clauses, taken in connection with clause 48, name or specify the Sterling type quite accurately. Clause 48 reads:

"In all boilers constructed to have the water tubes connected direct to the steam and water drums, there shall be at least three drums containing steam and water, and one water drum."

Clause 49 provides that this type of boiler shall be a four pass baffle boiler.

Clause 73 provides that the tubes shall not be less than four inches in diameter. In the Sterling type the tubes are four inches in diameter. A great many boiler makers use the three-inch tube, and their equipment is designed to punch that sized hole in the plates. The water and steam space provided or called for in clause 45 is calculated upon a 42-inch drum, and this is the size of the standard Sterling drum. There can be no possible doubt but that the commissioner of water drew and prepared these clauses of the specifications to meet and fit the conditions of the standard type of the Sterling boiler manufactured solely by the Babcock & Wilcox Company. If there could be any doubt as to this proposition, it vanishes and is dissipated by the statement of Mr. Stage, director of public utilities, made at a meeting of the board of control, May 10, 1915, at which meeting the matter of proposals for the Division avenue pumping station was under consideration. A stenographic report of the proceedings of that meeting is in evidence. Mr. Stage, speaking of proposals for boilers in 1914, possibly the Fairmount station, is reported to have said:

"Boiler men were here, claiming that it was unfair for the city of Cleveland, through its division of public utilities, to make specifications which permit other boiler manufacturers to bid, and then did not give consideration to their bids, because the water department engineer, if not the director of public utilities, was wedded to the B. & W. Boilers Now, we have made it perfectly evident that that is true, and we are shouting it from the house-tops, and we are yelling it just as loud as we can yell it, that it is true, that that is the type of boiler we want."

These are "winged words," and yet it can not be said they do not voice correctly the state of mind of the director of public utilities, for Mr. Baker, the mayor, a witness during the hearing before the court, in his testimony, remarkable for its candor, frankness, clarity and lucidity of statement, said:

"Mr. Stage came to me and told me that he had decided to advertise for exactly the thing that was wanted; that it was specified the B. & W. or Sterling type of boiler, and that he had determined to have the specifications quite frankly do that. And

he told me his reasons for doing it was, in the first place, that it was the type the department wanted, and he believed, as director of the department, that they had the right to have what they wanted; and in the second place, he did not think it would be fair to advertise what might be called wide open specifications and invite manufacturers to make types of boilers which the department knew in advance it did not want, and it was putting men to the expense of making bids and stating specifications and putting in those bids when there was no possible chance of their being successful.''

From this clear and concise statement, it appears that the director of public utilities did not believe it was good policy to advertise for ''wide open specifications,'' for the reason that in so doing they might get or be tendered boilers ''which the department knew in advance it did not want.'' This is tantamount to saying that the department would not take and did not want boilers of a certain type or class, no matter how efficient or well adapted to the purposes in hand such boilers might be. Of course these gentlemen relied mostly upon the judgment of Mr. Schulz, the commissioner of water, though it may be said that for men of no practical factory or shop experience, or men who never pulled a throttle or turned a steam valve as a means of livelihood, they are evidently possessed of quite a remarkable knowledge of boiler efficiency and construction. That Mr. Schulz believes the Babcock & Wilcox Company's type of boilers is the best anywhere made, is admitted. He is quite frank in his preference in this direction. Indeed, it is more than a preference; it is a bias in favor of that type and a prejudice against all other types of styles of boilers. The testimony distinctly shows that his prejudice is unwarranted, that his bias is the result of a one-sided tendency of his mind, a species of sterling auto-hypnotism, and is not the result of thorough, candid, impartial investigation. The specificatons provide that proposals must state the location of installations, so that the commissioner of water or the director of public utilities may make inquiries as to the efficiency of such installations. There is an installation in the Philadelphia water works department of the Badenhauser

boiler type, where the same number of prime mover units are used or required that are required for the Division avenue pumping station. Mr. Schulz was aware of this installation, and upon one occasion visited Philadelphia, but did not think it necessary to examine it in actual operation. While this particular installation was in process of finding itself, and the employees operating it were engaged in finding it, some defects were noticed and reported to Mr. Schulz by the superintendent of that station; but after the boilers had found themselves, and after the engineers and stokers had thoroughly understood the method of using these boilers, an entirely different report was made, showing high efficiency and that the boilers gave complete satisfaction in every respect. This was also reported to Mr. Schulz, but ignored by him, evidently upon the theory that nothing good could come out of the Badenhausen Nazareth.

The last question asked Mr. Schulz by counsel for the plaintiff was this:

"Q. Now, candidly, Mr. Schulz, as an engineer, don't you think that if the city, instead of attempting to dictate to designers of boilers, had merely specified the results which they desired should be obtained or attained by the boilers submitted to competition, and then thrown the door open to all designers of boilers, that you could have had competition and yet been able to select from the competing boilers the best one?"

To this question he promptly answered: "I candidly think that that would not have been the case."

In other words, he distinctly says that the city, in his opinion, could not obtain the best boiler equipment or installation through competition. This is an admission that there was no competition, and that when the specifications were drawn it was not intended that there should be. It must be said, however, that the testimony does not disclose in the slightest degree, nor was it even hinted in argument, that the mayor, the director of public utilities, and the commissioner of water were not absolutely and irreproachably honest in their belief that the city of Cleveland would be best served by the purchase of the types of boilers

called for by the specifications. Their integrity of purpose and honesty of motive in the premises is not questioned by any one. It is admitted, and must be admitted, that these gentlemen were actuated solely and only by a high sense of civic duty in their desire to secure for the people of Cleveland the best and most efficient boiler installation for the Division avenue pumping station that the market afforded. With this desire and the motives that prompted it, we are in full accord; and yet, in their desire to accomplish a purpose and result above and beyond the faintest breath of suspicion, and a purpose possibly beneficient and wise if measured by considerations pertaining to the present, have they not lost sight of the potential possibilities for evil in the future if the principle of competition is ignored, undermined or destroyed?

Looking to the future, we are inclined to hold, that in order to preserve inviolate the principle of competitive bidding in the purchase of supplies, it is to the interest of a municipality to undergo and suffer some loss and inconvenience if necessary in the present, if by so doing the evils of gross fraud in the future are eliminated and prevented.

Section 3811 of the General Code provides that:

"No municipal corporation shall adopt plans or specifications for a public improvement required by law to be made by contract let after competitive bidding, which requires the exclusive use of a patented article or process, protected by a trade mark, or an article or process wholly controlled by any person, firm or corporation or combination thereof."

But it is claimed that this section of the Ohio Code has no bearing upon the issues before us, for the reason that the city of Cleveland is operating under a charter giving it full power of local self-government, and that the provisions of the charter relating to competitive bidding are not as broad as those of the statute. And indeed the claim is made that the city may practically, in the exercise of its powers of local self-government, do whatever it chooses to do or deems best.

It will not be denied that this section of the Code embodies at least the settled policy of the state.. The statute was in existence long before the Constitution as amended September, 1912, conferred upon municipalities the option to exercise the powers of local self-government in the manner therein provided.

Section 167 of the Charter of the city of Cleveland provides for public improvements of all kinds, employment of labor, and the necessary purchase of supplies and material therefor "by contract duly let after competitive bidding."

Section 119 of the Charter provides that the commissioner of supplies, before making purchases, "shall give opportunity for competition under such rules and regulations as the council shall establish."

The same phraseology, that is, competitive bidding and competition, is used in the ordinances and resolutions of the council relating to this improvement. The framers of the Charter, when they used these terms, phrases or words, used them undoubtedly in the sense in which they were then, and before that time had been, understood.

In *State, ex rel,* v. *Lynch,* 88 O. S. ,71, the interpretation of the words, or, rather, what was meant by the words "the powers of local self-government," found in Section 3, Article XVIII of the Constitution, was before the court. This is the amendment of September, 1912, granting to municipalities the power of local self-government. Shauck, J., in the opinion, page 96, said:

"In the amendment the phrase is used without definition and with the manifest intent that its operation should be according to its established meaning. It is fundamental in interpretation that statutes in derogation of the common law and amendments to statutes and constitutions shall have such and only such operation as is due to the natural import of their terms. The effective search for truth as well as the decorum due the convention and the people by whom the amendment was framed and adopted requires us to impute to them a knowledge of that fundamental and familiar rule, and also to assume that they expected the courts to apply it to their work. Since municipalities get their powers from the state, it is mathematically certain that they

can include no power not possessed by the state. Local self-government is necessarily a part of government less than the whole.''

Again, in *Fitzgerald* v. *Cleveland,* 88 O. S., 338, the construction of the same phrase was before the court. Johnson, J., page 359, said:

''It is a well-settled rule that the body adopting amendments such as are here involved will be presumed to have had in mind the course of legislation and existing statutes touching subjects dealt with.''

And the learned judge cites *People, ex rel Jackson,* v. *Potter,* 47 N. Y., 380, and cases there cited in support of the proposition. See also *Quigg* v. *Evans,* 121 Cal., 546.

We have no doubt but that by the phrase ''competitive bidding,'' found in Section 167 of the Charter, the framers of that instrument meant to prohibit municipalities from adopting plans or specifications for a public improvement which require the exclusive use of an article controlled by any person, firm or corporation, and we so hold. This is the meaning given these words when found in statutes, not only by our own but by the courts of practically all the states.

The case of *Smith* v. *Syracuse Improvement Company,* 161 N. Y., 484, is directly in point. No. 2 of the syllabus reads:

''A petition for the pavement of a street in the city of Syracuse, 'with vitrified paving brick, manufactured by the New York Brick and Paving Company, of Syracuse, N. Y.,' and all the proceedings had thereon by the common council, are in violations of the provisions of the city charter requiring the work to be let to the lowest bidder, and are void, when it appears that the company referred to has a complete monopoly upon the disposal of such brick, and that there are other persons or corporations who manufacture and sell vitrified brick for paving purposes, equal in quality to the particular kind specified.''

This was practically done in the specifications under consideration. It is true that the Babcock & Wilcox Company is not expressly named, but it is so in effect.

If a municipality advertised for a thousand tons of coal, and specified that the coal should have a carbon content of at least 90 per cent., everyone would know that anthracite was meant as specifically as if it had been named, as no other coal could meet the requirement. It is no answer that any well-equipped boiler manufacturer could make the boilers called for; and for the reason, in addition to those already stated, that the discretion vested in the board of control, the director of public utilities and the commissioner of water, to determine who is the best as well as the lowest bidder, would most probably enable the board, the director and the commissioner to so award the contract as to secure the type of boiler the director of public utilities declared in advance that the city wanted and was determined to have.

It has been held that "lowest and best bidder" means one who complies with all the requirements of the specifications, not merely one whose bid is less than his competitors. *Boseker* v. *Wabash County Commissioners,* 88 Ind., 267.

And again, the question of responsibility in the sense of being accountable and able to discharge the obligation so as to save the city from loss may be involved in determining the question of the best or most responsible bidder. *Gutta-Percha Company,* v. *Stokely,* 11 Phila., 219, 221.

Under the specifications as drawn, it would be difficult indeed to assail the discretion that might be exercised in these respects. The city seemed determined to secure just what it wanted, and nothing else, no matter how efficient it might be, and prepared specifications with that end in view; and so far as the specifications are concerned, they most admirably provide for that result; for if the specifications are not sufficient to secure the end sought, the right is reserved to reject any and all bids.

It is difficult to understand why the defendant municipality should attempt to exclude any type of boiler, in view of clauses 134 and 135 of the specifications. These sections read:

"Before acceptance of the boilers by the City of Cleveland, Ohio, they will be operated by the city employees for a period

of ninety days, during which time they will be subjected to such examinations and tests as may be considered advisable to determine whether or not the conditions of the specifications and the contract have been complied with.  The contractor or his representatives to have free access to any boilers during these ninety days, but they are not to interfere with the operation or test.

"The evaporation tests to determine the economy and capacity of these units shall be made by the commissioner in accordance with the rules of the American Society of Mechanical Engineers."

It is difficult to imagine how any boiler maker, in view of these clauses and in view of the fact that he is required to give bond for the faithful performance of his contract, would undertake this installation and the expenditure it entails, unless he felt morally certain, if not absolutely assured, that he could meet the tests and trials required.  It is still more difficult to conceive how the municipality could be in any way injured, or be in any way in danger of any loss, by any installation of any kind or type of boilers installed if the installation met the trials and tests herein provided for.  Surely no man or corporation would expend over forty thousand dollars experimentally and run the risk of such loss if his installation proved a failure.  If the boilers installed did not develop the efficiency and meet all the conditions demanded by the specifications after trial and test of ninety days, they could be rejected and ordered taken out.

In *Fischer Auto & Service Company* v. *Cincinnati et al*, 16 N.P.(N.S.), 369, the question of purchasing an automobile for the city of Cincinnati was under consideration.  The court found that no known make of automobile, except the Hudson, came within the requirements of the specifications, every other machine being disqualified by reason of overweight or some other distinguishing feature; and it was admitted that the Hudson was the make the city wanted, and that the specifications were drawn to effectuate that purpose.

It was held that, under the specifications, competition was commercially impracticable, and the city was enjoined from awarding the contract.

Where county commissioners desired stone for the super-structure of a bridge, it was provided in the specifications that "all stone to be used for masonry in superstructure and wing walls of said bridge must be what is known as Berea bridge stone, and come from the quarries at the town of Berea, Ohio." In No. 5 of the syllabus it is held:

"Anything which tends to abridge the right of tax-payers, so far as public improvements are concerned, to purchase at the lowest price in an untrammeled market, is in violation of the law. Nor is it necessary that an evil appear or that injury is done; it is sufficient that the inevitable tendency of the act is injurious to them. *Thrailkill* v. *Amlin et al*, 13 O. D., 34.

In *National Surety Company* v. *Kansas City Hydraulic Pressed Brick Company*, 73 Kans., 196, it appears that the brick made and sold by but one company was specified. It was held that this was "contrary to public policy in restricting and preventing free competition."

See also *Swift* v. *St. Louis*, 180 Mo., 80 to 89; *Glennon* v. *Gates*, 136 M. App., 421.

It will be quite unnecessary to cite, as might be done, many additional authorities to the same effect. Counsel for defendants cite *Hobart* v. *City of Detroit*, 16 Mich., 246, and *Saunders* v. *Iowa City*, 134 Ia., 132.

In the first of these cases the opinion was written by Judge Cooley, a jurist of acknowledged preeminent ability. The doctrine of these cases is only an exception to the general rule based upon necessity. Otherwise the doctrine laid down does not differ materially from that in cases generally relating to this subject.

If a municipality desires, for certain avenues or boulevards, devoted mainly to the use of pleasure vehicles, an asphalt pavement because of its greater resiliency, it may specify Trinidad asphalt, for the reason that it is universally recognized as superior to all others for paving purposes. The softening point of this asphalt is 160° F., while that of the Venezuelan is 113° F., and that of Cuba as low as 100° F. It is unnecessary to state that an asphalt the melting point of which is as low as 100°, or

even 113°, if used as a pavement in this latitude might, on some day of August or July, become a "shirt of Nessus" to automobiles driven thereon. Hence the necessity for using an asphalt, if asphalt must be used, of a higher melting or softening point; and as the Trinidad asphalt only meets the requirement, it becomes a necessity. The Trinidad asphalt concession does not expire until 1930, and it is therefore a natural monopoly; and if the interests of a city demand it for a particular pavement, the city must either pay the market price or dispense with that kind of material.

Again, an article may be patented, but be of such superior excellence that necessity demands its use. For instance, suppose a police or fire alarm system transcendentally superior to any now known should be discovered and patented; the city of Cleveland might be compelled to adopt it, or else lose its place "on the hill." In the Detroit case the city felt it 'must have the Nicholson pavement shortly after that species of pavement came upon the market. It was a patented article, and was foolishly for a time supposed to be the *ne plus ultra* or last word in paving. The city of Detroit believed it was a necessity, as did many other cities at that time. In the Iowa case it seems large claims had been made for a patented bitulithic pavement, and the city and a majority of the property owners on a certain street, believing their health, convenience and pleasure depended upon it, petitioned for it and got it. The decision turned largely upon the construction of the Iowa code, but the court, in the opinion, page 145, used this very significant language:

"What is meant by this statute is, that there must be competition where competition is possible."

If Iowa City wanted a bitulithic pavement, and nobody but the patentee made it, and the city believed its necessity demanded it, why, of course competition was not possible under such circumstances.

We think the rule is stated quite accurately in Section 1204, *McQuillin on Municipal Corporations*. A portion of this section is as follows:

"As already stated, one of the exceptions to the rule requiring competitive bidding exists where the subject-matter of the contract has a monopoly, as in the case of a contract for lighting where there is only one light company in the municipality."

The board of control of this city need not be informed of the efforts which the city made to rid itself of the evils of monopoly in electric lighting where there was practically but one electric light company in the city; and all will remember that the citizens of Cleveland voted a bond issue of two million dollars for the purpose of erecting a municipal light plant, in order that the people might not be subject to the extortions and exactions of that monopoly. It is a matter of common observation that the erection of this plant, even before it was prepared to distribute current to users, had a salutary effect upon the price of electricity used for lighting and power purposes. We think a bare reference to this subject will be sufficient to indicate the necessity for competition in every instance where competition is at all practical or possible. But quoting from McQuillin further, Section 1204, the author says:

"On the other hand, a different proposition presents itself where there are several manufacturers who produce a certain article, and where other material can be secured from two or more different localities. In such a case it is held in nearly all the decisions that bidding can not be restricted by requiriing bids on unpatented articles manufactured by a particular firm, or material obtained from a particular locality. In other words, where specifications are so drawn as to confine the bidding to one company, firm or individual, although others are engaged in the same business and can do the work or supply the materials, a contract let thereunder is void. Thus, where the specifications limited the rock asphalt to be used to that mined in four mines, it was held in Louisiana that they were too narrow, where good rock asphalt is obtainable from many mines." Citing *Redersheimer* v. *Flower*, 52 La. Ann., 2089; 28 So. 299.

We believe the doctrine here laid down is conclusive of the issues in the case before us, and therefore the prayer of the petition will be granted; and as the hearing is upon the merits, the injunction will be made perpetual.